EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* TERRY TERROL TORRES LOZADA, acusado y apelante.

*Número:* CR-77-24    *Resuelto:* 14 de diciembre de 1977

*Celedonio Medín Lozada* y *Celedonio Medín Lozada Gentile,* abogados del acusado; *Héctor A. Colón Cruz, Procurador General,* y *Lirio Bernal de González, Procuradora General Auxiliar,* abogados de El Pueblo.

### SENTENCIA

Estando basado el registro de las pertenencias del apelante en las disposiciones de la Ley Núm. 22 de 6 de agosto de 1975 y no existiendo la mayoría absoluta requerida por la Constitución para invalidarla(**) se confirma la sentencia apelada. El Juez Asociado Señor Rigau no intervino. El Juez Asociado Señor Irizarry Yunqué emitió opinión en que se postula la inconstitucionalidad de la citada ley. El Juez Presidente Señor Trías Monge y los Jueces Asociados Señores Dávila y Torres Rigual se unen a dicha opinión. Los Jueces Aso-

(**)El Art. V, Sec. 4 dispone:

"El Tribunal Supremo funcionará, bajo reglas de su propia adopción, en pleno o dividido en salas compuestas de no menos de tres jueces. Ninguna ley se declarará inconstitucional a no ser por una mayoría del número total de los jueces de que esté compuesto el tribunal de acuerdo con esta Constitución o con la ley."

ciados Señores Martín, Díaz Cruz y Negrón García emitieron opiniones separadas sosteniendo la legalidad del registro y la constitucionalidad de la citada ley.

Así lo pronunció y manda el Tribunal y certifica el Secretario.

(*Fdo.*) Ernesto L. Chiesa
*Secretario*

—0—

Opinión emitida por el Juez Asociado Señor Irizarry Yunqué a la que se unen el Juez Presidente Señor Trías Monge y los Jueces Asociados Señores Dávila y Torres Rigual.

San Juan, Puerto Rico, a 14 de diciembre de 1977

El 6 de agosto de 1976 el apelante arribó al Aeropuerto Internacional de Isla Verde en vuelo comercial procedente de Miami, Florida. Una vez recogió sus maletas y cuando se disponía a abandonar el área de reclamo de equipaje, dos agentes de la Policía de Puerto Rico se le acercaron, se identificaron y le mostraron una tarjeta informativa de la Ley Núm. 22 de 6 de agosto de 1975, que en su Sec. 1, 25 L.P.R.A. sec. 1051, dispone:

"Autorización a inspeccionar

"Se faculta y autoriza a la Policía de Puerto Rico, a inspeccionar el equipaje, paquetes, bultos y carteras de pasajeros y de la tripulación que desembarquen en los aeropuertos y muelles de Puerto Rico provenientes de los Estados Unidos, examinar carga que sea traída al país y llevar a cabo la detención, interrogación y registro de aquellas personas sobre las cuales tuvieren motivos fundados para creer que portan ilegalmente sobre su persona armas de fuego, explosivos, sustancias narcóticas, deprimentes o estimulantes o sustancias similares."

Los agentes requirieron del apelante que los acompañara con su equipaje a la oficina del Negociado de Investigaciones Criminales del terminal. Allí practicaron lo que llamaron "un chequeo rutinario" de su equipaje y, en una de las ma-

letas, hallaron y ocuparon una bolsa de papel con picadura de marihuana y una pipa de fumar que contenía residuos de esa sustancia. Lo arrestaron y fue acusado y convicto de violar el Art. 404 de la Ley de Sustancias Controladas, 24 L.P.R.A. sec. 2404.

Planteó sin éxito ante el tribunal sentenciador, y reproduce ante nosotros el apelante, al no estar conforme con el fallo condenatorio y la sentencia impuéstale de 1 a 3 años de prisión, que la sustancia y la pipa ocupadas son inadmisibles por ser el producto de un registro ilegal y que la citada ley es contraria a la Cuarta Enmienda de la Constitución Federal y a la Sec. 10 del Art. II de la Constitución del Estado Libre Asociado. No hay controversia en que la detención y registro de las pertenencias del apelante se hicieron sin que hubiera motivos fundados para creer que violaba la ley. Bajo tales circunstancias, el registro fue ilegal y lo ocupádole inadmisible en el proceso criminal instituido en su contra. En cuanto la citada disposición permite registros indiscriminados, como el aquí efectuado, es inconstitucional.

El tribunal a quo sostuvo la legalidad del registro hecho al apelante a base de la doctrina sobre registros en las fronteras adoptada por el Tribunal Supremo de los Estados Unidos. Dicha doctrina no puede tomarse como autoridad para justificar un registro efectuado, como el que aquí nos ocupa, en franca violación de la Enmienda IV de la Constitución federal y del Art. II, Sec. 10 de la Constitución del Estado Libre Asociado.

La doctrina federal que permite los registros en la frontera que, dicho sea de paso, no ha estado exenta de crítica, (1) salva el requisito de razonabilidad exigido por la Enmienda IV a base de que ninguna persona que viaje a Estados Unidos

(1) Véase *Border Searches and The Fourth Amendment*, comentario en 77 Yale L.J. 1007 (1967–68); *Search and Seizure at the Border—The Border Search*, 21 Rutgers L. Rev. 513 (1967) e *Intrusive Border Searches —Is Judicial Control Desirable?*, 115 U. Pa. L. Rev. 276 (1966).

procedente de un país extranjero tiene derecho a entrar al país sin identificarse y sin permitir que sus pertenencias sean investigadas. Al efecto, se dijo en *Almeida-Sánchez* v. *United States*, 413 U.S. 266, 272 (1972):

"Es indudable el poder del Gobierno Federal para excluir a los extranjeros de entrar a este país. *Chae Chan Ping* v. *United States*, 130 U.S. 581, 603–604. No existe duda tampoco de que este poder puede efectuarse mediante inspecciones y registros rutinarios de individuos o de objetos de transporte que se propongan cruzar nuestras fronteras. Según dijo el Tribunal en *Carroll* v. *United States*: 'Los viajeros que cruzan una frontera internacional pueden ser detenidos en aras de la propia protección nacional, que razonablemente requiere del que entra al país que se identifique como persona autorizada a entrar, y sus pertenencias como efectos que pueden ser legalmente entrados al país.'" 267 U.S., en la pág. 154. Véase además *Boyd* v. *United States*, 116 U.S. 616.

La entrada a Puerto Rico de personas que provengan de países extranjeros, está regulada por los estatutos federales de aduana e inmigración.(²) Para esos efectos, nuestras fronteras son fronteras de los Estados Unidos.(³) Por otra parte, cuando se trata de la entrada de personas y efectos que proceden de los Estados Unidos las nuestras son fronteras estatales. Una vez en los Estados Unidos, toda persona tiene derecho a viajar de un lado a otro y cruzar las fronteras entre los Estados sin ser molestada (*free passage without*

---

(²)*"Immigration and Nationality Act"*, 8 U.S.C. secs. 1101–1503.

(³)8 U.S.C. sec. 1101(36), (38), las cuales definen "State" y "United States" de la manera siguiente:

"(36) The term 'State' includes (except as used in section 1421(a) of this title) the District of Columbia, Puerto Rico, Guam, and the Virgin Islands of the United States."

"(38) The term 'United States', except as otherwise specifically herein provided, when used in a geographical sense, means the continental United States, Alaska, Hawaii, Puerto Rico, Guam and the Virgin Islands of the United States. For the purpose of issuing certificates of citizenship to persons who are citizens of the United States, the term 'United States' as used in section 1452 of this title includes the Canal Zone."

*interruption*, según *Carroll* v. *United States*, 267 U.S. 132, 154, 45 S.Ct. 280, 69 L.Ed. 543 (1925)). Es un derecho al que se ha reconocido rango constitucional y no puede ser irrazonablemente afectado por regulaciones locales. *Shapiro* v. *Thompson*, 394 U.S. 618 (1969); *United States* v. *Guest*, 383 U.S. 745 (1966). Los Estados no han sido autorizados para detener a todo el que traspase sus fronteras y registrarlo sin que hayan motivos fundados para ello. No se ha establecido tal excepción a la Enmienda IV.(⁴)

De hecho, en el citado caso de *Almeida-Sánchez*, supra, se revocó la convicción recaída contra un ciudadano mejicano que cruzó la frontera de los Estados Unidos y que transportaba en su automóvil una gran cantidad de marihuana en violación de 21 U.S.C. sec. 176a (ed. 1964), porque el regis-

---

(⁴) Esta distinción entre personas que entran a los E.E.U.U. y aquellas que se mueven dentro de los E.E.U.U., a los fines del requerimiento de causa probable para realizar un registro se halla también incorporada en la *Federal Plant Pest Act*, 71 Stat. 31–34, 7 U.S.C. secs. 150aa–150gg, a saber:
"Sec. 150aa. Definitions
"(e) 'United States' means any of the States, Territories or Districts (including possessions and the District of Columbia) of the United States.
"(f) 'Interstate' means from one State, Territory or District (including possessions and the District of Columbia) of the United States into or through any other such State, Territory or District."
"Sec. 150ff. Inspections and seizures, warrants
"Any properly identified employee of the Department of Agriculture shall have authority to stop and inspect, without a warrant, any persons or means of conveyance moving into the United States, and any plant pests and any products and articles of any character whatsoever carried thereby, to determine whether such persons or means of conveyance are carrying any plant pest contrary to this chapter and whether any such means of conveyance, products or articles are infested or infected by or contain any plant pest or are moving in violation of any regulation under this chapter; to stop and inspect, without a warrant, any persons or means of conveyance moving interstate, and any plant pests and any products and articles of any character whatsoever carried thereby upon probable cause to believe that such means of conveyance, products, or articles are infested or infected by or contain any plant pest or are moving subject to any regulation under this chapter, or that such persons or means of conveyance are carrying any plant pest subject to this chapter . . . ."

tro del automóvil no se hizo en la frontera. El registro fue hecho a 20 millas de la frontera por una patrulla federal de fronteras, amparada en la Sec. 287 (a) (3) de la *Immigration and Nationality Act*, 66 Stat. 233, 8 U.S.C. sec. 1357 (a) (3), que autoriza el registro de automóviles y otros medios de transporte "dentro de una distancia razonable de cualquier frontera exterior de los Estados Unidos," de conformidad con la reglamentación a promulgarse por el Procurador General. La reglamentación adoptada en tal virtud, 6 CFR sec. 287.1, define "distancia razonable" aquella "dentro de 100 millas aéreas de cualquier frontera externa de los Estados Unidos." Dijo el Tribunal, págs. 272–273:

"Cualquiera que sea el alcance de intromisión permisible durante un registro fronterizo rutinario, registros de esta naturaleza pueden ocurrir en ciertas circunstancias no solamente en la frontera en sí, sino también en su equivalente funcional. Por ejemplo, registros en una estación cerca de la frontera en un punto en que confluyan dos o más carreteras que se extiendan desde la frontera pueden constituir equivalentes funcionales de registros fronterizos. Para otro ejemplo, el registro de los pasajeros y de la carga de un avión que llegue a un aeropuerto de San Luis en vuelo sin escala procedente de Ciudad de Méjico sería claramente un equivalente funcional de un registro fronterizo.

Pero el registro del automóvil del peticionario por una patrulla de la frontera en una carretera que está en toda su extensión por lo menos 20 millas al norte de la frontera con Méjico fue muy diferente. En ausencia de causa probable o consentimiento para ello, el registro violó el derecho del peticionario bajo la Enmienda IV a estar protegido contra 'registros y allanamientos irrazonables.' "

*United States* v. *Schafer*, 461 F.2d 856 (9th Cir. 1972), no es precedente que sostenga la validez del registro interestatal ni mucho menos la de una ley como la que aquí nos ocupa. La ley que se invocó en *Schafer* es una ley federal. Dicha ley autoriza al Secretario de Agricultura de los Estados Unidos a decretar una cuarentena con respecto a cual-

quier estado o territorio si determina que tal cuarentena es necesaria para evitar la diseminación de alguna enfermedad peligrosa o insecto dañino a la agricultura, y en tal caso ordena que se publiquen avisos de la existencia de la cuarentena para conocimiento público. 7 U.S.C. sec. 161.

Una vez decretada y publicada la existencia de la cuarentena, la ley autoriza expresamente a cualquier empleado del Departamento de Agricultura encargado de hacer cumplir dicha ley por el Secretario de Agricultura, que esté debidamente identificado, y *que tenga causa probable para creer* que una persona, vehículo o nave, transporta, sea del extranjero o moviéndose entre los Estados, plantas o productos prohibidos por dicha ley o por el decreto de cuarentena, a detener (*stop*) a la persona y sin necesidad de orden registrarla y ocupar y destruir dichas plantas y productos, 7 U.S.C. sec. 164a.([5]) Dicha ley no autoriza un registro caprichoso de la persona.

De conformidad con la expresada ley, el Secretario de Agricultura decretó una cuarentena para el Estado de Hawaii. Cuando la Sra. Schafer se preparaba para abordar un avión en Hawaii con destino al continente, un empleado de Agricultura federal, inspector de cuarentena, descubrió en

---

([5]) El texto completo en inglés es como sigue:

"Any employee of the Department of Agriculture, authorized by the Secretary of Agriculture to enforce the provisions of this chapter and furnished with and wearing a suitable badge for identification, *who has probable cause to believe* that any person coming into the United States, or any vehicle, receptacle, boat, ship, or vessel, coming from any country or countries or moving interstate, possesses, carries, or contains any nursery stock, plants, plant products, or other articles the entry or movement of which in interstate or foreign commerce is prohibited or restricted by the provisions of this chapter, or by any quarantine or order of the Secretary of Agriculture issued or promulgated pursuant thereto, shall have power to stop and, without warrant, to inspect, search, and examine such person, vehicle, receptacle, boat, ship, or vessel, and to seize, destroy, or otherwise dispose of, such nursery stock, plants, plant products, or other articles found to be moving or to have been moved in interstate commerce or to have been brought into the United States in violation of this chapter or of such quarantine or order." (Énfasis suplido.)

su bolso una sustancia herbácea que le pareció marihuana y llamó a un policía local, quien verificó que la sustancia era marihuana y arrestó a la Sra. Schafer. Al hacer entonces un registro más minucioso se encontró tabletas de la droga LSD en su bolso y en su maleta.

Al sostener en apelación la convicción de la Sra. Schafer por violar la ley federal de drogas—21 U.S.C. sec. 360a (c) (1) —fue cuidadoso el Noveno Circuito de señalar que aquí no se trataba de un registro de naturaleza "criminal" y sí de un "registro administrativo." Citó a *Frank* v. *Maryland,* 359 U.S. 360, 383 (1959), donde se dijo: "La norma sobre 'causa probable' requerida por la Cuarta Enmienda puede tomar en cuenta la naturaleza del registro que se persigue." Y señaló a renglón seguido: "La Corte en *Camara* [6] interpretó este lenguaje para significar que la norma 'criminal' de causa probable no sería impuesta en casos de inspecciones administrativas." 461 F.2d pág. 858.

Más adelante—461 F.2d 859—señaló el tribunal:

". . . Además, la decisión de inspeccionar no está 'sujeta a la discreción del empleado en el campo.' 387 U.S. pág. 532, 87 S.Ct. pág. 1733. En vista de que una inspección de cuarentena no es un registro 'que tiene por objeto obtener información . . . que puede ser usado para efectuar una privación de la vida, la libertad o la propiedad,' [cita a *Frank* v. *Maryland*], y el hecho de que 'es dudoso que otra técnica de inspección obtendría resultados aceptables,' [cita a *Camara*] creemos que la determinación administrativa general de la necesidad de estos registros de equipaje en el aeropuerto de Honolulu satisface los requerimientos de 'causa probable' de *Camara*."

Como hemos visto, el Tribunal Supremo federal ha establecido una distinción entre registros o inspecciones administrativas y aquellos que se hacen con fines de detectar la comisión de delitos, que son los denominados registros "criminales." El requisito de causa probable para los segundos es

---

(6) Se refiere a *Camara* v. *Municipal Court,* 387 U.S. 523 (1967), 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967).

básico para superar la prohibición de la Cuarta Enmienda. *Camara* v. *Municipal Court*, 387 U.S. 523 (1967) y *See* v. *City of Seattle*, 387 U.S. 541 (1967). Consúltese Riester & McMillen, *Administrative Inspection Procedures Under the Fourth Amendment—Administrative Probable Cause*, 32 Albany L. Rev. 155, 171–172 (1967); *The Law of Administrative Inspections: Are Camara and See Still Alive and Well?*, 1972 Wash. U.L.Q. 313, 322 (1972); Rothstein & Rothstein, *Administrative Searches and Seizures: What Happened to Camara and See?*, 50 Wash. L. Rev. 341, 345, 346 (1975).

Entre el caso *Schafer* y el que aquí nos ocupa hay las siguientes diferencias fundamentales: en *Schafer* la ley invocada para justificar el registro era una ley federal, aplicable a todos los estados, al Estado Libre Asociado de Puerto Rico, a los territorios y posesiones y al Distrito de Columbia, mientras que el registro aquí hecho se ampara en una ley local que sólo aplica en Puerto Rico; el registro en *Schafer* obedeció a un propósito administrativo, mientras que el de aquí se dirigió a buscar "armas de fuego, explosivos, sustancias narcóticas, deprimentes o estimulantes o sustancias similares," que dice la Ley Núm. 22 en su Sec. 1, con fines de procesamiento criminal; y, la Sra. Schafer, como parte del público advertido por el decreto del Secretario de Agricultura, debía saber cuando intentaba salir de Hawaii que había una cuarentena y que estaba sujeta a inspección por los empleados de Agricultura federal, mientras que el aquí apelante llegó a Puerto Rico procedente del Estado de Florida y no tenía por qué anticipar que aquí sería registrado.

Por analogía, puede señalarse que se ha sostenido la razonabilidad del registro de personas antes de abordar un avión, como parte de las precauciones contra secuestros de aviones, a base de que dichas personas pueden optar por no abordar el avión. El caso de *United States* v. *Davis*, 482 F.2d 893 (1973), elabora esa posición. Expresa lo siguiente: "Para

resumir, los registros de personas y de los efectos personales inmediatos de los pasajeros potenciales en los aeropuertos con el propósito de hallar armas y explosivos son razonables bajo la Cuarta Enmienda *si cada pasajero potencial retiene el derecho a desistir del viaje en vez de someterse al registro.*" *United States* v. *Davis,* supra, a la pág. 912. Véanse además los casos de *United States* v. *Miner,* 484 F.2d 1075, 1076 (1973) y *United States* v. *Homburg,* 546 F.2d 1350, 1352 (1976).

Es de notarse que no obstante la urgencia presente en los registros de pasajeros que se efectúan para evitar la piratería aérea, se parte generalmente del supuesto del consentimiento expreso o implícito dado por el pasajero y así salvar la objeción constitucional. *United States* v. *Bell,* 464 F.2d 667, 675 (1972), citado en *United States* v. *Skipwith,* 482 F.2d 1272, 1276 (1973). La situación bajo la cual se lleva a cabo un registro contra la piratería aérea es muy distinta a la que contempla la citada Ley Núm. 22. Los registros para prevenir la piratería aérea se realizan en la única y última oportunidad disponible para evitar el desastre, con pérdidas de cientos de vidas, que puede significar que entre al avión el pirata armado. De ahí que se les haya equiparado en algunos casos a los registros fronterizos. La suposición de que el pasajero ha dado su consentimiento a base de su derecho de optar entre someterse al registro o desistir del viaje aéreo no ha estado exento de críticas, no obstante la justificación del registro. *United States* v. *Albarado,* 495 F.2d 799, 806–807 (1974); *United States* v. *Kroll,* 481 F.2d 884, 886 (1973); *Airport Security Searches and the Fourth Amendment,* 71 Colum. L. Rev. 1039, 1048–1049 (1971).

El concepto de equivalente funcional de frontera, del que se habló en *Almeida-Sánchez,* supra, págs. 223–273, fue recientemente considerado en *United States* v. *Mirmelli,* 421 F.Supp. 684 (D.C. N.J. 1976) (*certiorari* pendiente de consideración ante el Tribunal Supremo de los Estados Unidos).

Dicho concepto ha sido ampliado para referirse no solamente a aquellos aeropuertos localizados en el interior de los Estados Unidos al que llegan vuelos del extranjero que no hayan hecho escala, sino también a aquellos aeropuertos en que existen facilidades para inspección de aduana e inmigración.

No obstante tratarse, como hemos visto, de un equivalente funcional de frontera, se sostuvo la validez del registro que en ese caso se efectuó a base de que hubo motivos fundados para ello. Un avión de pasajeros procedente de Florida aterrizó en el Aeropuerto de Teterboro de Nueva Jersey. En vez de pasajeros se descargaron de él numerosas cajas de gran tamaño que eran rápidamente transportadas por los tripulantes del avión a un camión identificado como del Estado de Nueva York.

A pesar de que la información obtenida por los inspectores de aduana indicaba que las cajas contenían artículos de cerámica, eran transportadas del avión al camión en forma brusca y no apropiada para tal tipo de mercancía. Por otra parte, el contrato del camión señalaba que se transportaban instrumentos musicales. Ante tales hechos, los inspectores de aduana consultaron a su superior y fue luego de la autorización dádales por éste que procedieron a requerir que se abriera una de las cajas, encontrando que su contenido era marihuana. Las circunstancias del caso ante nos distan mucho de las que concurrieron en el referido caso.

Estamos conscientes del esfuerzo que realiza nuestro gobierno para impedir la entrada a nuestra Isla de drogas narcóticas, armas de fuego y explosivos, en un momento de nuestra historia en que el auge en su tráfico ilegal mantiene al pueblo en constante preocupación y ansiedad. No obstante, la razonabilidad de que hablan nuestra Carta de Derechos y la Enmienda IV para permitir registros y allanamientos no puede hacerse depender de tal situación histórica. Citamos de nuevo a *Almeida-Sánchez*, supra, págs. 274–275:

"El tribunal que emitió la decisión en *Carroll* v. *United*

*States,* supra, [7] tuvo por escenario un período de nuestra historia en que la Nación se enfrentó a un problema de no poca magnitud para hacer cumplir la ley—hacer cumplir las leyes de la Prohibición—. Pero aquel Tribunal resistió la presión de conveniencias oficiales contra la garantía de la Cuarta Enmienda. El Juez Presidente señor Taft, en la opinión del Tribunal, distinguió entre registros en la frontera y en el interior, distinción que controla el caso ante nos:

'Sería intolerable e irrazonable si se autorizare a un agente de la prohibición a detener todo automóvil para por ventura hallar licor y de tal manera sujetar a todas las personas que legalmente usen las carreteras a la inconveniencia e indignidad de semejante registro. Los viajeros que cruzan una frontera internacional pueden ser detenidos en aras de la propia protección nacional, que razonablemente requiere del que entra al país que se identifique como persona autorizada a entrar, y sus pertenencias como efectos que pueden ser legalmente entrados al país. Pero aquellos que se encuentran legalmente en el país, con derecho a hacer uso de las vías públicas, tienen derecho al tránsito franco sin interrupciones o registros a menos que sea del conocimiento de un funcionario competente para efectuar un registro que existe causa probable para creer que sus vehículos transportan contrabando o mercancía ilegal.' " 267 U.S., págs. 153–154.

El Juez Frankfurter hizo la siguiente admonición en su opinión disidente en *Harris* v. *United States,* 331 U.S. 145, 161; 67 S.Ct. 1098; 91 L.Ed. 1399, 1411 (1946) : (8)

". . . Si algo sobre este asunto puede afirmarse confiadamente es que la protección que ofrece la Cuarta Enmienda contra registros y allanamientos por la policía, excepto bajo las más estrictas salvaguardas judiciales, no es un mero residuo del racionalismo romántico del siglo XVIII y sí de una necesidad indispensable en una sociedad democrática."

Y el Juez Brandeis, a quien citó el Juez Frankfurter en la aludida opinión disidente, expresó que los padres de la

---

(7) 267 U.S. 132 (1925).

(8) La disidencia se convirtió eventualmente en la posición del Tribunal Supremo al revocarse expresamente a *Harris. Chimel* v. *California,* 395 U.S. 752 (1969).

Constitución "confirieron, en cuanto a protección contra el Gobierno, el derecho a la tranquilidad—el más abarcador de los derechos y el derecho más preciado por la gente civilizada. Para proteger ese derecho, toda intrusión injustificada por parte del Gobierno en la intimidad del individuo, no importa los medios empleados, tiene que considerarse una violación de la Cuarta Enmienda." *Olmstead* v. *United States*, opinión disidente, 277 U.S. 438, 478 (1927); 72 L.Ed. 944, 956. (⁹)

La Enmienda IV tuvo su origen en la reacción violenta del pueblo norteamericano contra los llamados *"writs of assistance"* de la época colonial, en virtud de los cuales se registraban indiscriminadamente los hogares de los ciudadanos. Su importancia ha quedado para siempre grabada en palabras de John Adams al comentar el famoso discurso de James Otis, Procurador General de la entonces Colonia de la Bahía de Massachusetts, al renunciar dicho cargo ante el abuso de aquellas órdenes de registro. El discurso de Otis encendió la chispa que movió a los colonos a rebelarse contra tales órdenes. Dijo Adams acerca de dicho discurso: "Allí y en aquel momento nació la independencia americana." 10 Adams, *Works* 247. (¹⁰) Véase *Blackford* v. *United States*, 247 F.2d 745, 748 (9th Cir. 1957).

Esa es la progenie de la disposición de nuestra Carta de Derechos que protege al pueblo contra los abusos de los registros y allanamientos injustificados. En la defensa del derecho reconocido en nuestra Constitución, como lo han hecho todos los Estados de la Unión, no podemos ser menos exigentes que el más alto Tribunal Federal.

La especial relación entre Puerto Rico y los Estados Unidos, basada en la existencia de un convenio—Ley Pública

---

(⁹) Posteriormente, en *Katz* v. *United States*, 389 U.S. 352 (1967), se revocó *Olmstead* y se adoptó la posición disidente.

(¹⁰) La famosa frase de Adams, en su original en inglés: "American independence was then and there born."

600, 81er. Congreso, L.P.R.A., tomo 1, págs. 144–145—no nos faculta para considerar a los Estados Unidos como un país extranjero y someter a todas las personas que de allá provengan al registro indiscriminado, sin orden de allanamiento y sin causa probable ni motivos fundados, de sus personas y pertenencias. El Estado Libre Asociado no es una república asociada. Es, lejos de eso, una condición política adoptada por nosotros, en Puerto Rico, basada entre otros principios fundamentales, en nuestra unión con los Estados Unidos y en que es factor determinante en nuestra vida la ciudadanía común "y la aspiración a continuamente enriquecer nuestro acervo democrático en el disfrute individual y colectivo de sus derechos y prerrogativas." Preámbulo de la Constitución del Estado Libre Asociado.

Nuestra condición geográfica como isla tampoco justifica hacer una excepción para nuestro caso de la Cuarta Enmienda. Nadie discutiría que tampoco procedería hacer tal excepción para Hawaii y Alaska por el hecho de no ser territorios contiguos a los 48 Estados ubicados en el continente, al sur de Canadá y al norte de México. Hawaii es un archipiélago mucho más distante que Puerto Rico del continente. Alaska tiene la particularidad de estar separado geográficamente de los otros estados y tener frontera con un país extranjero. Puerto Rico no tiene frontera con ningún país.

Además, si bien somos una isla, no son nuestros puertos de mar los lugares de entrada y salida de la mayoría de quienes viajan entre Puerto Rico y el continente. El tráfico de la inmensa mayoría de quienes entran y salen de aquí es por aire. Cuando se viaja por avión es irrelevante si la superficie sobre la cual se vuela es tierra o mar. Carece por tanto de importancia la distinción que pueda hacerse a base de nuestra condición de isla. Somos isla para el tráfico marítimo. Para el tráfico aéreo no hay diferencia entre ir de aquí a Miami e ir de Miami a Nueva York.

Por último, y en el supuesto de que la Cuarta Enmienda

no aplicara en Puerto Rico a los fines de la Ley Núm. 22 que aquí nos ocupa, no podemos pasar por alto que la misma prohibición subsistiría bajo la Constitución del Estado Libre Asociado, que postula como marco delimitador de la actuación policial, aparte de la prohibición específica contra registros irrazonables, el principio de inviolabilidad de la dignidad del ser humano. Las salvaguardas de la Constitución no se hicieron para un lugar y tiempo en particular. Es precisamente cuando cobra auge determinada modalidad del crimen y cunde la histeria colectiva cuando se ponen a prueba esos principios, y somos los Tribunales de Justicia los llamados a darles la vigencia que requieren, como valores esenciales de un régimen democrático como el que disfrutamos. Cuando se debiliten esos principios asomará sus garras y fauces el monstruo de la arbitrariedad y del despotismo. La Constitución es la Ley Suprema, adoptada directamente por el supremo legislador que es el Pueblo, y no autoriza a apartarse de lo en ella preceptuado, ni a actuar contra lo en ella prohibido. Las garantías que ella establece para el disfrute de la libertad no pueden debilitarse porque en un momento dado se debilite el orden. Hacer una excepción por razón de una situación del momento vulneraría para siempre el sistema democrático.

La Sec. 1 de la citada Ley Núm. 22 de 1975, en su parte final requiere, para la "detención, interrogación y registro de personas" que procedan de los Estados Unidos por parte de la Policía, que ésta tenga "motivos fundados para creer que portan ilegalmente sobre su persona armas de fuego, explosivos, sustancias narcóticas, deprimentes o estimulantes o sustancias similares." Sin embargo, la primera parte de la citada Sec. 1 "faculta y autoriza a la Policía de Puerto Rico a inspeccionar el equipaje, paquetes, bultos y carteras" de tales personas sin imponer requisito alguno sobre motivos fundados. En otras palabras, autoriza a la Policía a registrar indiscriminadamente el equipaje, paquetes, bultos y carteras de los pasajeros. No concebimos que esto pueda hacerse sin

que se detenga a la persona. De hecho el aquí apelante fue detenido al ser requerido que acompañara a los agentes con su equipaje a la oficina del Negociado de Investigaciones Criminales del terminal aéreo, sin que hubiera motivos fundados para creer que violaba la ley. El apelante no tenía alternativa ante tal requerimiento.

Ni la Enmienda IV de la Constitución federal ni el Art. II, Sec. 10 de la estatal nuestra hacen distinción entre el registro de personas y el de sus pertenencias para fines del requisito de razonabilidad. La Enmienda IV dispone:

"No se violará el derecho del pueblo a la seguridad de sus personas, hogares, documentos y pertenencias, contra registros y allanamientos irrazonables, y no se expedirá ningún mandamiento sino a virtud de causa probable, apoyado por juramento o promesa, y que describa en detalle el lugar que ha de ser allanado, y las personas o cosas que han de ser detenidas o incautadas."

Y la Sec. 10 del Art. II de la nuestra dice:

"No se violará el derecho del pueblo a la protección de sus personas, casas, papeles y efectos contra registros, incautaciones y allanamientos irrazonables.

No se interceptará la comunicación telefónica.

Sólo se expedirán mandamientos autorizando registros, allanamientos o arrestos por autoridad judicial, y ello únicamente cuando exista causa probable apoyada en juramento o afirmación, describiendo particularmente el lugar a registrarse, y las personas a detenerse o las cosas a ocuparse.

Evidencia obtenida en violación de esta sección será inadmisible en los tribunales."

Ante tan claras disposiciones constitucionales es inescapable la conclusión de que los registros autorizados por la Ley Núm. 22 que aquí nos ocupa están prohibidos. Una ley, no importa sus laudables propósitos, no puede autorizar lo que la Constitución prohíbe.

De interpretarse que la citada ley autoriza tanto la detención y registro de personas como el registro de sus perte-

nencias solo si hay motivos fundados que superen el requisito de razonabilidad habría que concluir que la Asamblea Legislativa realizó un acto fútil e intrascendente pues equivaldría a reiterar lo que ya está establecido estatutaria y jurisprudencialmente en nuestro país. Bajo la Regla 231 de Procedimiento Criminal [11] un registro por un funcionario del orden público se permite sólo mediante orden expedida por un magistrado en virtud de declaración escrita y jurada luego de quedar convencido de la existencia de causa probable o, sin que exista tal orden, cuando el registro es incidental a un arresto válido. *Pueblo* v. *Torres Resto*, 102 D.P.R. 532 (1974); *Rolón* v. *Tribunal Superior*, 96 D.P.R. 662 (1968); *Pueblo* v. *Riscard*, 95 D.P.R. 405 (1967). Cabe señalar que en este segundo supuesto—registro incidental a un arresto válido—siempre está presente el requisito de razonabilidad, pues el mero hecho de que concurra un arresto *legal* no convalida *ipso facto* un registro o una incautación sin orden. *Pueblo* v. *Dolce*, 105 D.P.R. 422 (1976); *Pueblo* v. *Costoso Caballero*, 100 D.P.R. 147 (1971); *Pueblo* v. *Polanco Marcial*, 95 D.P.R. 470 (1967); *Pueblo* v. *Sosa Díaz*, 90 D.P.R. 622 (1964).

Otra ponencia sometida en este caso defiende la validez

---

[11] "Regla 231. Orden de Allanamiento; Requisitos para Librarla, Forma y Contenido

No se librará orden de allanamiento o registro sino en virtud de declaración escrita prestada ante un magistrado bajo juramento o afirmación, que exponga los hechos que sirvan de fundamento para librarla. Si de la declaración jurada y del examen del declarante el magistrado quedare convencido de que existe causa probable para el allanamiento o registro, librará la orden, en la cual se nombrarán o describirán con particularidad la persona o el lugar a ser registrado y las cosas o propiedad a ocuparse. La orden expresará los fundamentos habidos para expedirla, y los nombres de las personas en cuyas declaraciones juradas se basare. Ordenará al funcionario a quien fuere dirigida registre inmediatamente la persona o sitio que en ella se indique, en busca de la propiedad especificada, y devuelva al magistrado la orden diligenciada, junto con la propiedad ocupada. La orden dispondrá que será cumplimentada durante las horas del día, a menos que el magistrado, por razones de necesidad y urgencia, dispusiere que se cumplimente a cualquier hora del día o de la noche."

constitucional de la Ley Núm. 22 bajo la teoría de que los registros en ella autorizados pueden considerarse parte del poder del Estado Libre Asociado de aprobar leyes de inspección como parte de su poder de reglamentación, que llaman el poder policial o poder de policía del Estado.([12])

El poder de los Estados, y del Estado Libre Asociado, de aprobar leyes generales de inspección bajo el poder de policía no se discute. Debe tenerse presente, sin embargo, que el propósito de tales leyes es autorizar inspecciones administrativas y no con propósitos penales. Ni *Gibbons* v. *Ogden*, 9 Wheaton 1, 6 L.Ed. 23 (1824), ni *Brown* v. *Maryland*, 12 Wheaton 419, 6 L.Ed. 678 (1827), ni *Mayor of the City of New York* v. *Miln*, 11 Peters 102, 9 L.Ed. 648 (1837), ni *Patapsco Guano Co.* v. *Board of Agriculture*, 171 U.S. 345 (1898), ni *Compagnie Francaise* v. *State Board of Health, Louisiana*, 186 U.S. 380 (1902)—casos en que se apoya la referida ponencia—se refieren a leyes que autorizan la inspección de objetos o personas con el propósito de obtener pruebas de actividad criminal, o impedir la misma, como lo hace la Ley Núm. 22 que nos ocupa.

*Gibbons* trata de una ley estatal concediendo el monopolio en la operación de barcos de vapor que chocaba constitucionalmente con una ley federal que concedía licencias para la operación de embarcaciones. *Brown* v. *Maryland* se refería a una ley estatal que requería que todo aquel que vendiera bienes importados del extranjero sacara una licencia estatal antes de vender el objeto. *Mayor of the City of New York*, trataba de una ley que requería a todo maestre de barco de pasajero procedente del extranjero o de otro estado de la unión, que entrara al puerto de Nueva York que rindiera un informe escrito del nombre, sitio de nacimiento y última residencia, edad y ocupación de todo pasajero del barco, ya fuera extranjero o ciudadano norteamericano (con excepción de

---

([12]) En inglés, *police power.*

Nueva York) y de todo pasajero que hubiese desembarcado o embarcado durante el viaje con el propósito de ir a Nueva York. *Patapsco Guano Co.* trataba de una ley estatal que permitía la inspección de fertilizantes, ya fueran producidos en ese estado o en otro, con el propósito de proteger a la ciudadanía de fraude. *Compagnie Francaise* se refería a una ley estatal de cuarentena que, entre otras cosas, prohibía que personas saludables entraran a comunidades declaradas bajo cuarentena.

El caso de *California* v. *Thomson*, 313 U.S. 109 (1941), reafirma el poder estatal para aprobar leyes de inspección, pero tampoco se contempla que el propósito de éstas sea descubrir pruebas delictivas sino proteger al pueblo de fraude y proteger el bienestar general.

La ponencia cita a *Stephenson* v. *Dept. of Agriculture*, 342 So.2d 60 (1977), cuya apelación fue denegada por el Tribunal Supremo (46 L.W. 3005, 3180). En este caso el Tribunal Supremo estatal declaró constitucional una ley estatal que obligaba a todo vehículo de motor, camiones y camiones con arrastre a detenerse en estaciones de inspección del Departamento de Agricultura y Servicios al Consumidor estatal para ser inspeccionados. Determinó que ello constituía un ejercicio válido del poder de policía del Estado.

El Tribunal Supremo de Florida, al declarar válida la ley, tuvo buen cuidado de señalar que los registros que autoriza tienen que basarse en el consentimiento del conductor del vehículo, o en la existencia de una orden de allanamiento y, en su defecto, a base de las causas legales reconocidas. Dijo el Tribunal:

". . . Al detenerse, la mayoría de los operadores de tales vehículos probablemente no tendrán objeción a tal inspección y consentirán a la misma; pero, según se dispone en el estatuto, si se rehusa el acceso, el vehículo no podrá ser inspeccionado sin una orden de allanamiento o sin una base legal para registrar sin orden conforme al Derecho reconocido. Ello en manera alguna afecta el derecho del apelante a no ser sometido a registros y

allanamientos irrazonables, al debido proceso de ley, o a la igual protección de las leyes. No hallamos que aquí se violen derechos constitucionales del apelante . . . .

Las inspecciones autorizadas por el estatuto en el caso ante nos caen bajo una categoría diferente. Las inspecciones agrícolas se asemejan más a las inspecciones de las licencias de los automovilistas que a las detenciones para propósitos de investigaciones criminales . . . ." 342 So.2d 60, 62 (1977).

Ante esas expresiones del tribunal estatal no alcanzamos a comprender que se pueda interpretar la denegatoria de la apelación por el Tribunal Supremo federal como una afirmación de un poder discrecional ilimitado del Estado para llevar a cabo inspecciones o registros administrativos.

El caso de *United States* v. *Biswell*, 406 U.S. 311 (1972), tampoco aplica al de autos, porque tampoco trata de un sistema de inspección estatal para asegurar pruebas para fines criminales. La inspección reglamentaria discutida en ese caso va dirigida a los negocios de armeros con licencia federal, con el propósito de determinar si están cumpliendo con la reglamentación federal sobre la venta de armas.

Interpretar que la Ley Núm. 22, en cuanto autoriza a la policía a registrar maletas, bultos y carteras de los pasajeros sin el requisito de orden de registro ni de motivos fundados autoriza meras inspecciones administrativas bajo el poder general de policía del Estado, sería forzar la letra y el espíritu de dicha ley más allá de lo racionalmente permisible. Los registros que dicha ley autoriza no son con fines confiscatorios exclusivamente. Los hechos de este caso así lo demuestran. El apelante fue detenido, acusado, juzgado y convicto como consecuencia de un registro de su equipaje efectuado en virtud de dicha ley. El poder de policía del Estado no es sinónimo del poder policíaco para detener personas y registrarlas sin motivos fundados. Esto último es lo que autoriza la Ley Núm. 22 contra las claras disposiciones constitucionales que lo prohiben.

La sentencia apelada debía ser revocada y decretarse la absolución del apelante.

—O—

Opinión separada del Juez Asociado Señor Martín concurriendo con la Sentencia y disintiendo de la opinión separada de la mayoría numérica del Tribunal.

San Juan, Puerto Rico, a 14 de diciembre de 1977

La controversia central de este caso gira en torno al derecho a la protección de los efectos de una persona contra registros irrazonables al amparo de la Sec. 10 del Art. II de la Constitución del Estado Libre Asociado de Puerto Rico a la luz de la disposición correspondiente contenida en la Enmienda IV de la Constitución de los Estados Unidos de América.

El trasfondo de la legislación que nos ocupa tiene su origen en la determinación que hace la Asamblea Legislativa, en su Séptima Sesión Extraordinaria reunida en el verano de 1975, [1] en el sentido de que "[E]s de conocimiento general que entre los pasajeros y tripulación que desembarca en la Isla proveniente de los Estados Unidos se encuentran personas que traen ilegalmente consigo o con su equipaje, bultos, carteras y paquetes, armas de fuego, explosivos, drogas narcóticas y otras sustancias controladas por ley." Y al efecto de que "[E]sto ha contribuido considerablemente a un aumento en el contrabando de armas de fuego, explosivos y drogas narcóticas por este medio, con sus resultados concomitantes que se manifiestan en un aumento en la criminalidad y una mayor inseguridad en la ciudadanía." [2]

Por otro lado podemos tomar conocimiento judicial de que en los aeropuertos de los Estados Unidos donde se originan

---

[1] Ley Núm. 22 de 6 de agosto de 1975, págs. 736–738, 25 L.P.R.A. secs. 1051–1054.

[2] *Ibid.*, Exposición de Motivos, págs. 736–737.

los vuelos dirigidos a Puerto Rico no se toman precauciones para evitar que los pasajeros y tripulación traigan en sus equipajes, armas de fuego, explosivos o sustancias controladas.

La indefensión de nuestras fronteras es evidente. El aumento en la criminalidad, de factura importada en medida sustancial, evidenciado por el número crecido de delitos provenientes de armas sin registrar, así como los relacionados con sustancias controladas y con explosivos, hizo imperativo que la Asamblea Legislativa, a través de la mencionada Ley Núm. 22, tomara medidas para combatir la criminalidad y, por ende, proteger la seguridad y proveer la tranquilidad de la ciudadanía.

Mediante la legislación aludida se autorizó a la Policía de Puerto Rico a inspeccionar el equipaje, paquetes, bultos y carteras de pasajeros y de la tripulación que desembarquen en los aeropuertos y muelles de Puerto Rico provenientes de los Estados Unidos y examinar carga que sea traída al país para determinar si contienen ilegalmente armas de fuego, explosivos y sustancias controladas. *Ibid.*, Ley Núm. 22, Sec. 1, 25 L.P.R.A. sec. 1051. Para ello, a mi juicio, no se requieren "motivos fundados" para creer que el mencionado equipaje, etc. contiene los artículos prohibidos señalados. Tal requisito de "motivos fundados" se exige en relación con el registro de personas. De entenderse que los "motivos fundados" deben existir tanto para los artículos mencionados como para las personas tendríamos que concluir que la Asamblea Legislativa estaba legislando en el vacío, o sea, ejercitando un acto fútil, toda vez que la Regla 231 de las de Procedimiento Criminal exige que los allanamientos o registros deberán ser efectuados previa orden librada por un magistrado ante quien se hubiese prestado una declaración bajo juramento o afirmación que exponga los hechos que sirvan de fundamento para librarla. 34 L.P.R.A. Ap. II, R. 231. Dicha Regla 231 cumple con el precepto constitucional contenido en

la Sec. 10 del Art. II de la Constitución de Puerto Rico y en la Cuarta Enmienda de la Constitución de los Estados Unidos que requiere que los mandamientos que autorizan los registros, allanamientos y arrestos deberán ser expedidos por autoridad judicial, y ello únicamente cuando exista causa probable apoyada en juramento o afirmación, describiendo particularmente el lugar a registrarse, y las personas a detenerse o las cosas a ocuparse.

No obstante la disposición constitucional aludida hay circunstancias en que la ley autoriza a un funcionario del orden público al arresto y al registro de personas, lugares o cosas sin mandamiento judicial. Reglas 11 y 12 de las de Procedimiento Criminal, 34 L.P.R.A. Ap. II, Rs. 11, 12. Ello es así: (1) cuando tenga motivos fundados para creer que la persona que va a ser arrestada ha cometido un *delito* en su presencia, *Id.*, R. 11(a), *Pueblo* v. *Cruz Rivera*, 100 D.P.R. 345 (1971); (2) cuando la persona arrestada hubiese cometido un delito grave (*felony*), aunque no en su presencia, *Ibid.*, R. 11(b), *Pueblo* v. *González Rivera*, 100 D.P.R. 651 (1972); ó (3) cuando tuviere motivos fundados para creer que la persona que va a ser arrestada ha cometido un delito grave (*felony*), independientemente de que dicho delito se hubiere cometido o no en realidad. *Ibid.*, R. 11(c).

La persona facultada para arrestar en todos los casos no tiene que ser necesariamente un funcionario del orden público, ya que en ciertas circunstancias puede hacerlo una persona particular. Esta podrá arrestar: (a) por un delito cometido o que se hubiese intentado cometer en su presencia, o (b) cuando en realidad se hubiese cometido un delito grave (*felony*) y dicha persona tuviese motivos fundados para creer que la persona arrestada lo cometió. *Ibid.* R. 12, 34 L.P.R.A. Ap. II, R. 12. Como podrá verse el arresto por persona particular está limitado a situaciones más estrictas que cuando lo practica un funcionario del orden público.

Una vez realizado el arresto, aun sin mandamiento, puede

llevarse a cabo un registro de la persona y del área bajo el control del arrestado, si éste es incidental a un arresto legal. *González Rivera*, supra. Tanto nuestra jurisprudencia como la del Tribunal Supremo de los Estados Unidos ha reconocido dichos registros a pesar de las disposiciones constitucionales que protegen el derecho contra registros irrazonables. *United States* v. *Robinson*, 414 U.S. 218 (1973); *Gustafson* v. *Florida*, 414 U.S. 260 (1973).

He reseñado precedentemente los casos en que la ley y la jurisprudencia se han apartado del sentido literal de la Cuarta Enmienda de la Constitución de los Estados Unidos y de la Sec. 10 del Art. II de la nuestra y ha permitido el registro sin mandamiento en los casos en que es incidental a un arresto válido. No he podido encontrar, sin embargo, ocasión alguna en que el registro pueda llevarse a cabo sin mediar el arresto legal. Entiendo, sin embargo, que puede haber circunstancias excepcionales que lo justifiquen. Nos enfrentamos a una legislación de emergencia que en su Exposición de Motivos recoge la crisis por la que atraviesa el país en la ola de crímenes que en gran parte se debe a la facilidad con que se adquieren armas, explosivos y sustancias controladas y a la forzosa impunidad hacia los que así actúan. En esas circunstancias respeto la sabiduría del legislador al legítimamente preocuparse por el desamparo e indefensión en que se encuentra la Rama Ejecutiva al no poder evitar la continua infiltración de los artículos criminosos a que se refiere la Ley Núm. 22. Luego de entrar al país su diseminación es imposible de controlar. Nunca antes estuvo tan justificada una acción de la Legislatura para aliviar, aunque fuese en parte, la incidencia en aumento en los actos delictivos señalados.

Reconozco que la protección contra los registros irrazonables debe mantenerse a toda costa pero no con perjuicio a la ciudadanía. El nervio central del problema se contrae a lo que constituye un registro razonable. La razonabilidad debe

juzgarse conforme la situación de hechos a la que se aplique, y solamente debemos apartarnos del precepto constitucional en casos de rigurosa exigencia. Estimo que ésta es una de esas situaciones. La propia ley exige que la intervención de la policía deberá ser en forma respetuosa y lo más breve posible. No se ha señalado ningún acto abusivo en la forma en que fue intervenido el acusado. El registro no fue de la persona del acusado. Fue limitado a las maletas donde se encontró una bolsa con marihuana, una pipa con residuos de dicha droga, y Doscientos Cincuenta Mil Dólares ($250,000) en efectivo. Entendemos que en otros casos se han encontrado sustancias controladas valoradas en millones de dólares. Véanse San Juan Star, 2 de diciembre de 1977; El Nuevo Día, 2 de diciembre de 1977. Nos enfrentamos a un caso claro en que la pequeña inconveniencia de un pasajero debe ceder al bienestar, a la seguridad, a la salud y a la protección del pueblo en general, el que, a falta de legislación efectiva, queda a merced de las consecuencias que acarrea el permitir que los contrabandistas de armas, explosivos y sustancias controladas se refugien bajo el palio protector de prerrogativas constitucionales, cuya razón de ser están basadas en los principios expresados en el preámbulo de nuestra Constitución al declarar "[Q]ue consideramos factores determinantes en nuestra vida . . . la fe en la justicia; la devoción por la vida esforzada, laboriosa y pacífica . . . y la esperanza de un mundo mejor . . . ."

Aunque la doctrina sentada en *Miller* v. *California*, 413 U.S. 15 (1973) y en *Hamling* v. *United States*, 418 U.S. 87 (1974), no es estrictamente aplicable a la situación de hechos presente en este caso, encuentro una analogía en lo allí resuelto a las circunstancias especiales a las que se confronta este país ante el auge desmedido del crimen a diferencia de otras áreas de los Estados Unidos.

En los citados casos el Tribunal Supremo Nacional tuvo que hacer una determinación sobre el derecho de los expen-

dedores de material pornográfico ante la alegada protección de la Enmienda Primera de la Constitución de los Estados Unidos que prohíbe al Congreso el aprobar ninguna ley que coarte la libertad de palabra o de prensa. En *Miller* el Tribunal al sopesar los patrones de decencia de la nación en general y el de la comunidad en particular expuesta a los materiales pornográficos declaró lo siguiente:

"No es realista ni constitucionalmente sólido el leer la Primera Enmienda en el sentido de requerir que la gente de Maine o de Mississippi acepten la exposición pública de conducta que se considera tolerable en Las Vegas o en la ciudad de Nueva York (citas). La gente en los distintos Estados varían en gustos y actitudes, y esta diversidad no ha de ser estrangulada por el absolutismo de una uniformidad impuesta. Según lo hizo claro la Corte en *Mishkin* v. *New York*, 383 U.S., a las págs. 508–509, la preocupación primordial al requerir al jurado que aplique la norma de 'la persona promedio aplicando las normas de la comunidad' es para estar seguro que comoquiera que el material no va dirigido a un grupo desviado de las normas, deberá ser juzgado por su impacto sobre la persona promedio, y no sobre una persona particularmente susceptible o sensitiva—ni sobre una totalmente insensible. (Citas.) Sostenemos que el requisito de que el jurado evalúe los materiales con referencia a los 'patrones contemporáneos del Estado de California' sirve el propósito protector y es constitucionalmente adecuado." Págs. 32–33.

La analogía a la que nos referimos supone la distinción entre la situación única (*unique*) de Puerto Rico y los otros estados que componen la nación y que son parte de un solo bloque. La situación peculiar nuestra nos expone a una incontrolable corriente de los artículos mencionados por la ley sin medios de impedirla. Nos hemos esforzado en adoptar una Ley de Armas tan estricta como la más, así como una Ley de Sustancias Controladas y una Ley de Explosivos, las cuales no podemos efectivamente administrar ante la inundación de los artículos ilegalmente importados a los que se refiere la Ley Núm. 22. Podemos tomar conocimiento judicial de que en muchos Estados no hay un control efectivo de

armas, por lo que éstas pueden obtenerse en el mercado libre con una facilidad relativa. Siendo los Estados Unidos uno de los productores de armas mayores del mundo, se hace asequible la obtención de las mismas por cualquier persona. Ante esa realidad debe protegerse el pueblo puertorriqueño. Y compete a los legisladores hacerlo de manera efectiva.

Por entender que la Asamblea Legislativa actuó dentro de sus facultades constitucionales al aprobar la Ley Núm. 22 de 6 de agosto de 1975 y que el registro del equipaje del acusado se ajusta a normas de razonabilidad según ha determinado el legislador luego de considerar la situación de indefensión contra la criminalidad por la que atraviesa el país, concurro con la sentencia del Tribunal que confirma la sentencia apelada, y disiento de la opinión separada suscrita por la mayoría numérica del Tribunal.

—O—

Opinión emitida por el Juez Asociado Señor Díaz Cruz.

San Juan, Puerto Rico, a 14 de diciembre de 1977

El apelante llegó al Aeropuerto Internacional de Isla Verde en vuelo comercial procedente de Miami, Fla. Su conducta y apariencia captaron la atención de agentes de la Policía de Puerto Rico destacados en el aeropuerto, quienes sin orden de registro ni motivos fundados para arrestar, practicaron un "chequeo de rutina" en el equipaje del recién llegado, según autoriza la Ley Núm. 22 de 6 de agosto de 1975 (25 L.P.R.A. sec. 1051 y ss.), y ocuparon en una de sus maletas una bolsa de papel con picadura que resultó ser marihuana, una pipa de madera con residuos de dicha sustancia en su interior, y la suma de $250,000 en efectivo. En el juicio seguido por infracción del Art. 404 de la Ley de Sustancias Controladas (24 L.P.R.A. sec. 2404), solicitó el acusado la supresión de la evidencia obtenida de su equipaje por ser fruto de un registro ilegal, impugnando la dicha Ley Núm.

22 por contravenir tanto la Cuarta Enmienda de la Constitución de los Estados Unidos como el Art. II, Sec. 10 de la Constitución del E.L.A. Rechazó el juez de instancia el planteamiento basado en la autoridad de *Henderson* v. *United States,* 390 F.2d 805 (1967); *John Bacall Imports, Ltd.* v. *United States,* 287 F.Supp. 916 (1968); *United States* v. *Stornini,* 443 F.2d 833 (C.A. 1st Cir. 1971); ([1]) y *Cervantes* v. *United States,* 263 F.2d 800 (9th Cir. 1959). Fundamentó además su decisión con las siguientes expresiones: "Es de conocimiento general que Puerto Rico confronta un agudo problema de tráfico y contrabando de drogas narcóticas, armas de fuego y explosivos por parte de personas que transitan libremente entre Puerto Rico y Estados Unidos. Dicho problema se ha agudizado en los últimos años no empece las gestiones que las autoridades, tanto locales como federales, han hecho para enfrentarse al mismo. Esto se debe en gran parte por no contar Puerto Rico en sus aeropuertos y muelles con una oficina que registrara equipaje, paquetes, bultos y carteras de pasajeros y tripulantes que se mueven entre Puerto Rico y los Estados Unidos. Se hacía pues necesario, que el Gobierno del Estado Libre Asociado de Puerto Rico tomase algún tipo de acción correctiva efectiva para eliminar ese tráfico clandestino que estaba incrementándose y convirtiéndose cada vez más en un mercado más lucrativo por no estar éste tampoco fiscalizado por el Gobierno de los Estados Unidos de América. En esta área no existe ningún tipo de control efectivo de parte del gobierno federal, [que] se limita únicamente a los registros esporádicos que hace el Departamento de Agricultura de Estados Unidos en busca de frutos y plantas tropicales que puedan ser nocivas a la salud pública y a la agricultura. . . . [E]n las actuales circunstancias en que se vive en Puerto Rico hacen imperativo que los Tribunales reexa-

---

([1]) "Customs officer may search an individual's baggage and outer clothing in a reasonable manner, based on subjective suspicion alone, or even on a random basis." *Stornini,* supra.

minemos las doctrinas de derecho vigentes y adoptemos aquellas que mejor sirvan a los intereses de toda una sociedad, especialmente cuando está envuelta su seguridad pública y tal vez su propia existencia y atemperemos el derecho a las circunstancias presentes."

Convicto el acusado y sentenciado el 7 de enero último a reclusión de 1 a 3 años, sus planteamientos en apelación se limitan a impugnar la legalidad del registro y la constitucionalidad de la Ley.

## I

*La Ley Núm. 22 de 6 de agosto, 1975, distorsionada*

Hay algún criterio que califica la inspección rutinaria de equipajes y bultos en aeropuertos y muelles de Puerto Rico como vulnerante de la Cuarta Enmienda de la Constitución de los Estados Unidos y del Art. II, Sec. 10, de la nuestra. Vamos primero a releer el Art. 1 de la Ley Núm. 22 y saltará a la vista que autoriza dos funciones distintas de la Policía en los aeropuertos y muelles: una, *inspección* de equipajes, paquetes, bultos y carga para lo cual no exige "motivos fundados"; y la otra, detención interrogación y *registro* de aquellas personas sobre las cuales tuvieren *motivos fundados* para creer que portan ilegalmente *sobre su persona* armas de fuego, explosivos, sustancias narcóticas, deprimentes o estimulantes, o sustancias similares. No hay que confundir los dos conceptos tan cuidadosamente separados por el legislador de inspección (de equipaje y carga) y registro (de personas) descartando el claro texto del estatuto y buscando apoyo en las ambiguas expresiones en el debate legislativo hechas por el representante Sr. Del Valle Escobar, que no es abogado, pero que dijo lo bastante para desautorizar la posición de que esta Ley no concede más facultad para inspeccionar equipajes que la autorizada por las Reglas de Procedimiento Criminal, y tomamos del Diario de la Cámara (2 de julio de 1975):

"Sr. López Soto: Esta facultad que se le da a la Policía, ¿hay que dársela por esta medida legislativa, no la tiene la Policía ya como tal?

Sr. Del Valle Escobar: Según nos informó el Superintendente de la Policía y el Secretario de Justicia, no la tiene en estos momentos, hay que dársela por ley. Por eso es que hay que aprobar este Proyecto de Ley.

Sr. López Soto: ¿A qué se debe que no tiene la Policía esa facultad?

Sr. Del Valle Escobar: La Aduana no chequea debidamente este equipaje y estas entradas que tienen estas personas a Puerto Rico. Con este Proyecto se autoriza a la Policía para supervisar cualquier sospechoso y entonces investigarle la carga . . . ."

Se ha prescindido a veces de esta porción del debate legislativo imputándole a la Asamblea Legislativa un acto vano al sostener que el debate parlamentario demuestra que con la Ley Núm. 22 "no se quiso dar a la Policía más autoridad que la que permiten las Reglas de Procedimiento Criminal." Tanto los legisladores como el Secretario de Justicia y el Superintendente de la Policía, en cuyos informes basó su recomendación el Representante Sr. Del Valle Escobar, sabían que desde el año 1963 regían en Puerto Rico unas Reglas de Procedimiento Criminal que autorizaban el registro de equipaje y mercancía con causa fundada, y sabían que dichas Reglas se aplican a los aeropuertos y muelles dentro del territorio de Puerto Rico. Su recomendación, aceptada por la Asamblea Legislativa, no fue que se legislara para hacer las Reglas extensivas a aeropuertos y muelles, sino para dar a los agentes de orden un instrumento no provisto en dichas Reglas: autoridad para *inspeccionar* equipajes y carga aun cuando no existan motivos fundados para dicha intervención. La futilidad e ignorancia que a la Asamblea Legislativa atribuye este razonamiento no excluye la posibilidad de que un día se legisle para extender el Código Penal a Ponce o la Ley Hipotecaria a Caguas.

Manteniendo el caso en su justa perspectiva, forzoso es

concluir que no se legisló para fomentar el turismo. (²) De lo que sí había necesidad, para fortalecer el orden y la seguridad pública, era de un método que le permitiera a la Policía inspeccionar equipajes sin intervenir con la persona dueña de los mismos, un modesto remedo del registro de frontera o de su equivalente funcional que ya ha ganado acceso al Derecho público norteamericano. De ahí la distinción básica en su texto entre inspección de equipajes y registro de personas. Sostener lo contrario es imputar a la Asamblea Legislativa la torpeza de un acto superfluo e inútil, como lo sería aprobar para el aeropuerto y los muelles las mismas reglas de registro y arresto que desde el año 1963 cubren dicha demarcación. Se podrá extraer tan peregrina conclusión aislando frases del contexto general del confuso debate legislativo, pero el texto de la ley que finalmente fue aprobado es de claridad meridiana. A nosotros nos obliga la claridad del estatuto y no la ambivalencia de los debates, consistentes con la fundamental deferencia del poder judicial a la lógica, la inteligencia y la capacidad de nuestros legisladores, que no abdicaron el derecho de Puerto Rico a proteger la seguridad de su gente.

## II

### *Poder inherente del Estado*

Ordena el Art. II, Inciso 10 de la Constitución de Puerto Rico:

"No se violará el derecho del pueblo a la protección de sus personas, casas, papeles y efectos contra registros, incautaciones y allanamientos irrazonables.

No se interceptará la comunicación telefónica.

Sólo se expedirán mandamientos autorizando registros, allanamientos o arrestos por autoridad judicial, y ello únicamente cuando exista causa probable apoyada en juramento o afirma-

---

(²) No empece el prolongado debate constitucional sobre inspecciones y registros, y la exposición de motivos, en determinado momento se insinuó que el propósito de la Ley Núm. 22 está vinculado al fomento del turismo.

ción, describiendo particularmente el lugar a registrarse, y las personas a detenerse o las cosas a ocuparse.

Evidencia obtenida en violación de esta sección será inadmisible en los tribunales."

La Enmienda Cuarta de la Constitución de los Estados Unidos dice:

"No se violará el derecho del pueblo a la seguridad de sus personas, hogares, documentos, y pertenencias, contra registros y allanamientos irrazonables, y no se expedirá ningún mandamiento, sino a virtud de causa probable, apoyado por juramento o promesa, y que describa en detalle el lugar que ha de ser allanado, y las personas o cosas que han de ser detenidas o incautadas."

La fundamental protección, que es al mismo tiempo prohibición de excesiva intrusión por el Gobierno, se da contra registros "irrazonables" y es dicho concepto de presencia o ausencia de *razonabilidad* el que prepondera tanto en la Constitución de los Estados Unidos como en la nuestra. A la determinación de razonabilidad se llega tomando en cuenta todas las circunstancias, particularmente las de exigencias urgentes, en un balance entre los derechos del individuo y las necesidades de la sociedad. *Terry* v. *Ohio*, 392 U.S. 1 (1968); *Elkins* v. *United States*, 364 U.S. 206 (1960); *United States* v. *Biswell*, 406 U.S. 311 (1972). La legalidad de registros sin orden judicial, y aun sin mediar causa probable, de individuos y vehículos al cruzar la frontera tuvo un temprano reconocimiento por legislación del Congreso y doctrina judicial. *Boyd* v. *United States*, 116 U.S. 616 (1886); *Carroll* v. *United States*, 267 U.S. 132, 134 (1925). La excepción se basa en la protección nacional que requiere de todo el que entra a un país se identifique como persona acreedora a ello, y su propiedad como efectos que pueden ser legalmente introducidos. *Carroll*, supra. Desde un principio no se consideraron comprendidas en la prohibición de la Cuarta Enmienda las leyes autorizando el registro y confiscación de objetos cuya posesión por la persona está vedada, como moneda falsa o artí-

culos de contrabando. *Boyd* v. *United States*, supra, pág. 624; *cf. United States* v. *Ramsey*, 52 L.Ed.2d 617, 626 (1977).

Bajo esta premisa se ha sostenido que inspecciones de rutina y registro de personas y de su equipaje en la frontera o punto de entrada pueden realizarse aún sin que haya causa probable. La autoridad para llevar a cabo estos registros se extiende al llamado "equivalente funcional" de la frontera como puede serlo un aeropuerto al que arriba un avión que ha volado sobre la frontera. *Almeida-Sánchez* v. *United States*, 413 U.S. 266, 272–3 (1973); *cf. United States* v. *Brinoni-Ponce*, 422 U.S. 873 (1975); *United States* v. *Ortiz*, 422 U.S. 891 (1975).

Puerto Rico es un pueblo organizado bajo un régimen constitucional cuya autoridad política se extiende a la Isla de Puerto Rico y a las islas adyacentes. Const. Art. I, Sec. 3. Su Gobierno tiene la obligación de mantener la paz y la seguridad públicas, elementos esenciales de la fe en la justicia, y de la vida esforzada, laboriosa y pacífica, que son ideales enunciados en el Preámbulo de nuestra Constitución. En el año 1975 la Asamblea Legislativa de Puerto Rico reconoció la existencia en nuestro país de un grave problema de seguridad fomentado por la introducción ilícita de armas de fuego, explosivos y drogas narcóticas a través de aeropuertos y muelles por pasajeros y tripulaciones que nos llegan de los Estados Unidos, y se expresó en la Exposición de Motivos de la Ley Núm. 22 de 6 de agosto de 1975, pág. 736, así:

"Puerto Rico está actualmente enfrascado en una vigorosa campaña dirigida a prevenir la compraventa, transferencia y uso ilegal de drogas narcóticas, armas de fuego y explosivos.

Es de conocimiento general que entre los pasajeros y tripulación que desembarca en la Isla proveniente de los Estados Unidos se encuentran personas que traen ilegalmente consigo o en su equipaje, bultos, carteras y paquetes, armas de fuego, explosivos, drogas narcóticas y otras sustancias controladas por ley. El Gobierno Federal no requiere que estos pasajeros o tripulación pasen por Aduana a su arribo a la Isla para que se examine su

equipaje y persona. Esto ha contribuido considerablemente a un aumento en el contrabando de armas de fuego, explosivos y drogas narcóticas por este medio, con sus resultados concomitantes que se manifiestan en un aumento en la criminalidad y una mayor inseguridad en la ciudadanía.

La inspección del equipaje, carga y personas para reducir la introducción de armas de fuego, explosivos y drogas narcóticas que son traídos ilegalmente de Estados Unidos a Puerto Rico es un área legítima de control por parte de nuestro Gobierno en el ejercicio de su poder de Policía, máxime cuando la misma no está cubierta por el Gobierno Federal y no existe conflicto de autoridad al respecto entre ambos gobiernos."

Para enfrentar la situación, dispuso la citada Ley en su Sec. 1:

"Se faculta y autoriza a la Policía de Puerto Rico a inspeccionar el equipaje, paquetes, bultos y carteras de pasajeros y de la tripulación que desembarquen en los aeropuertos y muelles de Puerto Rico provenientes de los Estados Unidos, examinar carga que sea traída al país y llevar a cabo la detención, interrogación y registro de aquellas personas sobre las cuales tuvieren motivos fundados para creer que portan ilegalmente sobre su persona armas de fuego, explosivos, sustancias narcóticas, deprimentes o estimulantes o sustancias similares."

La Ley autoriza la inspección de rutina y al azar de equipajes y bultos en los puntos de entrada a nuestro país como aeropuertos y muelles que por analogía pueden considerarse "frontera". *Almeida-Sánchez, supra*. La Asamblea Legislativa actuó en válido ejercicio de su poder para proteger la vida, la libertad y la propiedad de los tres millones de puertorriqueños que poblamos la Isla.(³) El interés público en detener el arribo a nuestras playas y aeropuertos de instru-

---

(³) Tal acción por la Asamblea Legislativa, en ausencia de regulación federal, no plantea conflicto con esta jurisdicción. "Where, as here, Congress has not entered the field, a state may pass inspection laws and regulations, applicable to articles of interstate commerce designed to safeguard the inhabitants of the state from fraud, provided only that the regulation neither discriminates against nor substantially obstructs the commerce." *California* v. *Thompson*, 313 U.S. 109, 114 (1941).

mentos de destrucción, degradación y muerte toma precedencia sobre el derecho de los que llegan a que no se registre su equipaje. El derecho personal de privacidad cede al más preponderante derecho de la vasta comunidad puertorriqueña. Es violentar el ajuste entre el interés de la sociedad y el del individuo pretender que para combatir tan grave amenaza a la existencia misma de esta sociedad tenga el Gobierno que detenerse ante exigencias constitucionales que tienen otro lugar y tiempo. Los que introducen armas, drogas y explosivos no se detienen. La interpretación de la Constitución ha de responder a la época en que se emite honrando una actualidad que Jefferson recogió en su frase: "el mundo siempre pertenece a la generación del momento."

El Estado Libre Asociado tiene su génesis en la Ley Pública 600, 81er. Congreso titulada "Ley proveyendo para la Organización de un Gobierno Constitucional por El Pueblo de Puerto Rico" que en su preámbulo dice:

"POR CUANTO, el Congreso de los Estados Unidos por medio de una serie de acciones legislativas ha reconocido, progresivamente, el derecho que el pueblo de Puerto Rico tiene al gobierno propio; y

POR CUANTO, bajo los términos de esta legislación congresional, Puerto Rico ha ido obteniendo una medida cada vez mayor de gobierno propio, POR TANTO,

*Decrétase por el Senado y la Cámara de Representantes de los Estados Unidos de América, reunidos en Congreso,* Que, reconociendo ampliamente el principio del gobierno por consentimiento de los gobernados, se aprueba esta Ley, con el carácter de un convenio, de manera, que el pueblo de Puerto Rico pueda organizar un gobierno basado en una constitución adoptada por él mismo." L.P.R.A., Tomo 1, págs. 144–145.

El cuerpo político que eventualmente fundaron por mutuo consentimiento el Congreso y el Pueblo de Puerto Rico no es un estado federado, aun cuando se mantiene dentro de la estructura constitucional de Estados Unidos. Su fundación respondió a diferencias étnicas, culturales, y geográficas,

por lo que se le considera como entidad peculiar (*unique*) (⁴) en la que con limitada incidencia, tanto leyes como principios de federación operan en forma distinta a la normativa uniforme que gobierna los Estados de la Unión.

En el área que concierne a este caso, que es la de inspección de equipaje de viajeros procedentes de territorio norteamericano en nuestro Aeropuerto Internacional, se destaca con perfil excepcional la existencia de unas fronteras isleñas cuya naturaleza solo comparte el Estado de Hawaii. El territorio de Puerto Rico consta de unas 3,600 millas cuadradas rodeadas en todo su perímetro por aguas internacionales del Mar Caribe y el Océano Atlántico. Se produce aquí una solución de la continuidad geográfica que aglutina 48 de los estados continentales en una sola masa territorial protegidos en su seguridad y orden por la legislación convencional del Congreso y de las legislaturas estatales. No tienen, por tanto, aquellos estados la vulnerabilidad a la penetración de su territorio por traficantes en contrabando y portadores de mercancía ilícita que sufre Puerto Rico. (⁵) Estas condiciones han creado en Puerto Rico una frontera *de facto* para viajeros "domésticos" que requiere igual vigilancia que las fronteras internacionales de los Estados Unidos y debe entenderse que de no ocupar el campo las autoridades federales, como en efecto no lo ocupan, hubo suficiente delegación de ese poder fundamental de todo Estado para proteger la seguridad de su gente en el reconocimiento por el Congreso del "derecho que el pueblo de Puerto Rico tiene al gobierno pro-

---

(⁴) *Mora* v. *Mejias,* 115 F.Supp. 610 (1953); *Wackenhut Corp.* v. *Aponte,* 386 U.S. 268 (1967); *Calero-Toledo* v. *Pearson Yacht Leasing Co.,* 416 U.S. 663 (1974); *Examining Board of Engineers* v. *Flores de Otero,* 426 U.S. 572 (1976).

(⁵) Es de conocimiento general que Puerto Rico es centro de distribución de todo tipo de contrabando. Además de armas y drogas, el intenso tráfico incluye diamantes, al punto de que la columna sindicada de Pete Hamill del New York Daily News ha llamado a San Juan el "sucio y peligroso centro de mesa del racket internacional de diamantes." (San Juan Star, 21 Oct. 1977.)

pio" y en la intención manifiesta de "que el pueblo de Puerto Rico pueda organizar un gobierno basado en una constitución adoptada por él mismo." (Ley Pública 600, *supra*.) El poder del Estado Libre Asociado para proteger la seguridad de sus residentes "es consustancial mismo con su existencia como Estado, e inseparable de su poder político." *E.L.A.* v. *Rosso*, 95 D.P.R. 501, 536 (1967).

La uniformidad de estereotipo no es característica de la doctrina constitucional norteamericana. En materia de tan preciada valía como la libertad de palabra se ha dejado al criterio de las comunidades la aplicación de sus propios patrones de decoro y moral para decidir sobre la definición de una publicación obscena. *Miller* v. *California*, 413 U.S. 15 (1973); *Hamling* v. *United States*, 418 U.S. 87 (1974). No hay razón entonces para adoptar en Puerto Rico, una rigidez en cuanto concierne al movimiento de pasajeros entre estados, en todo caso excluida por la configuración política y geográfica especial del Estado Libre Asociado, que lo distingue de los Estados.

Un cuerpo político organizado bajo un sistema constitucional de "gobierno propio", aun con el mínimo grado de autonomía a que quede reducido, inevitablemente tiene autoridad para ejercer los poderes de policía necesarios para su propia seguridad y preservación, cerrando avenidas de amenaza a la paz pública en su territorio y supliendo vigilancia en el campo desamparado por los agentes del poder central metropolítico.

La disposición en la Ley Núm. 22 autorizando inspecciones y registros de rutina en los puntos de entrada a Puerto Rico está plenamente justificada y se mantiene dentro del concepto de razonabilidad que es parámetro de las cláusulas constitucionales que protegen contra indebida intrusión del Estado con la persona. La referida Ley Núm. 22, producto de un ponderado y razonable equilibrio de intereses, no contraviene ni la Enmienda IV de la Constitución de los Estados

Unidos ni el Art. II, Inciso 10 de la nuestra. El registro e incautación llevados a efecto en las circunstancias de este caso no rebasan la norma de razonabilidad.

Las obligaciones asumidas por los Estados Unidos en el Tratado de París de 1898 para la protección de vidas y haciendas en Puerto Rico y la facultad allí reservada al Congreso para determinar los derechos civiles y la condición política de los habitantes de esta Isla, la Ley Pública 600, la jurisprudencia federal reconociendo la figura de la frontera *de facto*,(6) el carácter peculiar del Estado Libre Asociado. dentro de la estructura constitucional norteamericana y la nueva apertura del Tribunal Supremo Nacional favoreciendo la autonomía de los estados y aun de comunidades, que propicia la diversidad dentro de la federación (*Miller* v. *California*, 413 U.S. 15 (1973); *Kewanee Oil Co.* v. *Bicron Corp.*, 416 U.S. 470 (1974)), son recios fundamentos de la constitucionalidad de la Ley Núm. 22. Contra ellos en ocasiones se reclutan unas definiciones de reverencia histórica contenidas en la Ley de Inmigración y Nacionalidad (8 U.S.C. secs. 1101–1503) y en la Ley Federal de Plantas Infectas (7 U.S.C. secs. 150aa–150gg) en la que se nos incluye como "posesión" de los Estados Unidos. El efecto del argumento es como si en el periódico de mañana encontráramos un titular: Hunden el "Maine" en la bahía de la Habana.'

Negarle constitucionalidad a la Ley produciría en análisis final dos premisas inaceptables: 1ª, este Tribunal le quita a la Rama Ejecutiva un recurso de lucha contra los delitos contemporáneos de terrorismo, drogas y asesinato, que se ha venido usando con moderación y bajo normas de civilidad, toda vez que la Policía registra equipaje en los contados casos de confidencia o conducta sospechosa del via-

---

(6) Este concepto de frontera *de facto* o equivalente funcional de frontera fue acogido en *United States* v. *Mirmelli*, 421 F.Supp. 684 (1976), donde se justifica la intervención con mercancía transportada entre estados con simple sospecha.

jero. De así decidir, el Tribunal estaría enervando el fundamental poder de todo estado, o gobierno organizado, si es que no vamos a reconocerle a Puerto Rico una configuración nacional, para garantizar la seguridad y la paz dentro de su territorio; y 2$^{da}$, este Tribunal dejando de lado nuestro frugal gobierno propio, prohijaría la anomalía jurídica de dos criterios de privacidad en el Aeropuerto Internacional de Isla Verde: los pasajeros que llegan de país extranjero pueden ser libremente intervenidos por los funcionarios federales de Inmigración y Aduana a solo pasos de distancia de los funcionarios de orden público de Puerto Rico que no podrían intervenir los viajeros que se mueven entre Estados Unidos y Puerto Rico. Todavía más claro, un puertorriqueño o individuo de cualquier otra nacionalidad que llega al Aeropuerto desde Suiza, Japón o Argentina tiene menos dignidad personal frente a los agentes federales que no se detienen ante su privacidad, que el viajero que nos llega del Bronx, Chicago, Chinatown o San Francisco, los cuales son intocables. Ni aun en el tiempo de la carreta y el caballo se concebía semejante desigualdad bajo un palio constitucional.

Puerto Rico, como todos los demás países del mundo libre, se confronta con gravísimos problemas de seguridad y de orden público. La Constitución es un organismo vivo, es la Ley de la Tierra adoptada para gobernar y proteger la sociedad civilizada. El manido "precio que hemos de pagar por la libertad" no debe inflarse al punto en que las instituciones libres sucumban ante la anarquía, el terrorismo, y el asesinato. Una mínima molestia a un viajero sospechoso de quien se requiera que abra su bulto o su cartera, práctica a la cual están acostumbrados los viajeros en todos los puertos de entrada del mundo civilizado, no justifica la anulación de la Ley Núm. 22 que autoriza estos registros y que representa la voluntad del pueblo en busca de sosiego contra el implacable azote del crimen.

Hay quien niega ese derecho de autoprotección a los puertorriqueños porque no tenemos otras "fronteras", que

las nacionales de los Estados Unidos. Pero entendiendo que aun los que nos ha tocado vivir "sin fronteras" tenemos algún derecho a la seguridad y a la paz en nuestro medio, esta opinión amparada en las decisiones del Supremo Federal en *Brignoni-Ponce, Ortiz,* y *Almeida-Sánchez,* clasifica nuestro Aeropuerto como "equivalente funcional" de frontera y para ello no hemos tenido que desviarnos de la doctrina constitucional norteamericana.

De prevalecer el argumento de que la Ley Núm. 22 no añade más poder de inspección a la Policía que el conferido por las Reglas, la Asamblea Legislativa hubiese realizado un acto inútil. Cuando su Sec. 1 habla de "motivos fundados" se refiere al registro de personas, pero no a la inspección de equipaje, bultos, carteras y paquetes. Esta fue una limitación que impuso la Asamblea Legislativa, ya que tanto en las "fronteras" como en los "equivalentes de frontera" la Cuarta Enmienda de la Constitución de Estados Unidos es inoperante, como sostiene la jurisprudencia aquí citada.

La Ley se aprobó para enfrentar el desamparo del país contra el tráfico cada día mayor de armas, drogas y explosivos. Esta situación necesitaba un mecanismo similar al que usa inmigración en las fronteras, más radical que los provistos por las Reglas de Procedimiento Criminal. Ese es el propósito de la Ley, claramente enunciado en su exposición de motivos, no importa cómo pueda leerse algún párrafo de las Comisiones de la Cámara. La letra de la Ley es su primera fuente de interpretación, y la que nos ocupa dice con gran claridad:

"Se faculta y autoriza a la Policía de Puerto Rico a inspeccionar el equipaje, paquetes, bultos y carteras de pasajeros y de la tripulación que desembarquen en los aeropuertos y muelles de Puerto Rico provenientes de los Estados Unidos, examinar carga que sea traída al país . . . ."

La Policía tiene un terso mandato de la Asamblea Legislativa para proteger a esta sociedad en el área crítica de

entrada al país. Anular la Ley para exigir normas de motivos fundados y causa probable tiene dos resultados a cual más infortunado: o la Rama Ejecutiva abandona la inspección de equipajes en el Aeropuerto y sigue con cauce franco la introducción de contrabando en nuestro suelo, o la Policía va a encontrar unos "motivos fundados" para intervenir, no ya con bultos y carteras, sino con personas.

Sería cuando menos rara faena para este Tribunal la de minimizar la acción del Congreso en la Ley Pública 600 enalteciendo el principio de "gobierno por el consentimiento de los gobernados" y facultando a Puerto Rico para que pueda "organizar un gobierno basado en una constitución adoptada por él mismo", en vez de propiciar que el Tribunal Supremo de los Estados Unidos pase sobre la validez del planteamiento constitucional. Esta legislación del Congreso trae causa de la obligación que bajo el Derecho Internacional asumieron los Estados Unidos para la protección de vidas y haciendas en Puerto Rico (Art. I, Tratado de París de 1898) y la declaración en el Art. IX del mismo Tratado, al efecto de que los derechos civiles y la condición política de los habitantes naturales de los territorios cedidos a los Estados Unidos se determinarían por el Congreso. ¿Tan maltrecha e inválida es la criatura de la voluntad del Congreso que está condenada a ser presa inerme de vulgares transgresores que pisotean el derecho a la vida, a la libertad y a la propiedad de este pueblo? La vida se compone de cosas fundamentales y de trivialidades. Debemos percibir éstas para no perder el rastro de aquéllas. No releguemos la dignidad de este pueblo a las maletas de un contrabandista.

### III

*La revisión judicial de las leyes*

Este es el más impresionante poder del Tribunal Supremo como guardador de la Constitución. Se ganó, en el crecimiento constitucional americano, sobre un vibrante núcleo de opinión

que veía en esta atribución la entrega del poder público a una "oligarquía togada". Sólo la moderación y educada abstención de la Rama Judicial en el ejercicio de esa facultad, ha conservado para ésta el prestigio y la aprobación del pueblo.

La Asamblea Legislativa de Puerto Rico, el más puro y legítimo representante de la voluntad popular, aprobó la Ley Núm. 22 como urgente y crítica medida de defensa de esta sociedad contra la saturación de violencia que ha anulado el derecho del pueblo a la vida, la libertad y la propiedad. No lo hizo como reacción histérica sino respondiendo a un estado de angustia y de inseguridad que ha descendido sobre Puerto Rico. La Legislatura actuó por humanidad, aún más que por su deber legislativo. Tuvo para ello el asesoramiento del Secretario de Justicia, el de eminentes abogados que ocupan escaños en el Senado y en la Cámara y del Servicio de Investigación [7] del Congreso. Será muy difícil para nuestra gente entender cómo es posible que un sistema de Derecho rinda la dignidad y la seguridad de tres millones de puertorriqueños ante el derecho de un contrabandista a que no le abran las maletas. La Constitución surgió para proteger los derechos del pueblo, no para rendirlos ni al Gobierno ni a transgresores comunes.

El ejercicio del poder judicial para anular legislación debe reservarse para las más chocantes transgresiones legislativas de expresas restricciones constitucionales. A la decisión de echar a un lado lo hecho por los legítimos representantes del pueblo, que es el soberano, debe llegarse como recurso infrecuente y doloroso y en circunstancias transcendentales que revistan dimensión constitucional. El reclamo de privacidad del apelante contrapuesto a la seguridad del Estado, no la tiene.

---

[7] Informe rendido por la Biblioteca del Congreso al Comisionado Sr. J. Benítez, el 4 de junio de 1975.

## IV

*Vitalidad contemporánea de la Constitución*

Un tribunal no debe renunciar a hacer el derecho constitucional que demanda el momento. La gran valía de la Constitución de los Estados Unidos como supremo instrumento de Derecho se la ha impartido en notable medida el pensamiento jurídico de los jueces a quienes les ha correspondido interpretarla a lo largo de dos siglos. Cada uno de ellos se enfrentó, en su día, a la problemática de su época. Sus decisiones, preservadas para los que le siguieron, tienen el prestigio de su inteligencia en función de análisis y declaración del Derecho como ellos lo entendieron. Mas si algún factor ha influido en el desarrollo del Derecho constitucional, éste ha sido el libre ejercicio creador de sus jueces, que no ataron su poder de decisión al recuerdo de lo que alguien dijo antes que ellos, ni lo encerraron en la cárcel conceptual del *stare decisis*. Los precedentes en Derecho constitucional como en cualquier otro campo sirven para guiar el pensamiento de las generaciones que siguen, pero no para aherrojar y paralizar la reflexión y la facultad deliberativa en el momento en que se producen. Si el criterio constitucional norteamericano se hubiese estancado, aferrado a precedentes anacrónicos la nación no hubiese advenido a la eclosión de libertad política y personal que disfrutan sus ciudadanos. Que la letra de la Constitución es una, pero variada la forma en que la han entendido las distintas generaciones de jueces, lo demuestra la dilatación del concepto "debido proceso" de la Enmienda XIV, originalmente propuesto para garantizar un juicio justo a los esclavos recién manumitidos, expandido para evaluar la constitucionalidad de leyes estatales en materias como la distribución y representación electoral; la negación de la jurisdicción federal a los negros por ser cosa o propiedad privada protegida por la Quinta Enmienda, y no ciudadanos (*Dred Scott* v. *Sanford*, 19 How. 393; 15 L.Ed. 691); la imposición

de una ceremonia de saludo a la bandera a los estudiantes de escuela pública, contra sus creencias religiosas, (*Minerville School District* v. *Gobitis*, 310 U.S. 586 (1940)) ; la distinción entre igualdad política y social bajo la "igual protección" de la Enmienda XIV que validó la separación de ciudadanos americanos por raza en escuelas, teatros, trenes y demás lugares de convivencia (*Plessy* v. *Ferguson*, 163 U.S. 537 (1896) ; 41 L.Ed. 256, 258) y la decisión de que los jueces no estaban sujetos al pago de contribución sobre ingresos que mermaba sus salarios. *Evans* v. *Gore*, 253 U.S. 245 (1920). Tan variados pronunciamientos, algunos de los cuales nos parecen hoy insólitos, respondieron al pensamiento jurídico del momento, moldeado inevitablemente por los conceptos éticos y morales, y las urgencias sociales de entonces. La evolución y el continuo avance de la civilización y los nuevos retos al orden jurídico, demandan un renovado derecho constitucional ajustado a nuestros días, libre en su ejercicio y desembarazado de precedentes sonoros, algunos de gran contenido humanitario, pero ineficaces hoy para proteger la propia Constitución de sus detractores. La democracia y las libertades no se defienden con cantos de alondra ni con odas que tuvieron su tiempo y lugar y que hoy son pie forzado de trovadores. El valor de la Constitución reside en su contenido vital de libertad que perdurará mientras los jueces que la lleven en su corazón puedan descubrir su contemporaneidad.

Sostengo la Ley y la decisión del Tribunal Superior.

—O—

Opinión del Juez Asociado Señor Negrón García.

San Juan, Puerto Rico, a 14 de diciembre de 1977

El caso de autos exige ". . . la ecuanimidad [necesaria] que permita conjugar los derechos individuales que desmesurados podrían resultar conflictivos entre sí y los derechos de la comunidad en su vida, salud y bienestar, representada esta

comunidad por la Asamblea Legislativa". 4 *Diario de Sesiones de la Convención Constituyente*, 2576 (Ed. 1961). Se plantea la validez constitucional de la Ley Núm. 22 de 6 de agosto de 1975 (25 L.P.R.A. sec. 1051), cuyo propósito fundado en el bienestar general queda evidenciado en su Exposición de Motivos:

"Puerto Rico está actualmente enfrascado en una vigorosa campaña dirigida a prevenir la compraventa, transferencia y uso ilegal de drogas narcóticas, armas de fuego y explosivos.

Es de conocimiento general que entre los pasajeros y tripulación que desembarca en la Isla proveniente de los Estados Unidos se encuentran personas que traen ilegalmente consigo o en su equipaje, bultos, carteras y paquetes, armas de fuego, explosivos, drogas narcóticas y otras sustancias controladas por ley. El Gobierno Federal no requiere que estos pasajeros o tripulación pasen por Aduana a su arribo a la Isla para que se examine su equipaje y persona. Esto ha contribuido considerablemente a un aumento en el contrabando de armas de fuego, explosivos y drogas narcóticas por este medio, con sus resultados concomitantes que se manifiestan en un aumento en la criminalidad y una mayor inseguridad en la ciudadanía.

La inspección del equipaje, carga y personas para reducir la introducción de armas de fuego, explosivos y drogas narcóticas que son traídos ilegalmente de Estados Unidos a Puerto Rico es un área legítima de control por parte de nuestro Gobierno en el ejercicio de su poder de Policía, máxime cuando la misma no está cubierta por el Gobierno Federal y no existe conflicto de autoridad al respecto entre ambos gobiernos."

Y en la formulación de esta ponencia recordamos que "el concepto de bienestar general tampoco es estático. Las necesidades que eran limitadas y sin importancia un siglo ha, pueden estar en nuestros días en íntima relación con el bienestar de la Nación. Lo que es imperativo o urgente cambia con los tiempos." Cardozo, citado en *Gobierno de la Capital v. Consejo Ejecutivo*, 63 D.P.R. 434, 445 (1944).

Con esta perspectiva presente, consignamos nuestro parecer de que dicha Ley es constitucional en cuanto autoriza a la policía de Puerto Rico inspeccionar rutinariamente equi-

paje y carga en el aeropuerto—sin sujeción a los criterios clásicos de motivos fundados—con el propósito de evitar la entrada al país de tres artículos, que en sus múltiples formas y modalidades ilegales, están fuera del ámbito del comercio lícito puertorriqueño, estatal y federal, a saber: armas, explosivos y sustancias controladas. [1]

De inmediato debemos aclarar que el presente caso no envuelve el registro de una persona, sino la inspección en el aeropuerto de una maleta en la que se intenta introducir marihuana. La inspección se realizó porque la conducta y apariencia del apelante—quien arribó desde Miami, Florida al Aeropuerto Internacional de Isla Verde—captaron la atención de los agentes de la policía en servicio. Ello sirvió de base para su convicción bajo la Ley de Sustancias Controladas (24 L.P.R.A. sec. 2404), y ante nos se argumenta expresamente la inconstitucionalidad del registro. [2]

## I

Hemos de reconocer que tanto el Art. II, Sec. 10 de nuestra Constitución, como la Cuarta Enmienda a la Constitución de los Estados Unidos garantizan al pueblo la protección contra registros *irrazonables*. Sin embargo, no todo registro o inspección viola esa salvaguarda fundamental.

Primeramente, varias leyes federales y decisiones judiciales que autorizan el registro de personas y equipajes sin la existencia de causa probable cobran precedente persuasivo. Algunas de ellas permiten el registro si existe sospecha; pero otras no imponen restricción alguna. Un ejemplo de estas últimas es la Sec. 287 (a) de la Ley de Inmigración y Nacio-

---

[1] No albergamos duda, y por ende no discutiremos, nuestro criterio de que bajo esta pieza legislativa, para la validez de un registro en la persona, es menester que medien "motivos fundados" según nuestra doctrina jurisprudencial.

[2] Advertimos que el apelante no cuestiona ni sugiere abuso físico o maltrato alguno de parte de los funcionarios policíacos en el descargo de sus deberes.

nalidad (8 U.S.C. sec. 1357(a)). Bajo esta disposición, el Tribunal Supremo, en el caso *Almeida-Sánchez* v. *United States*, 413 U.S. 266 (1973), si bien invalidó un registro efectuado a 20 millas de la frontera entre México y Estados Unidos—bajo la tesis de que no hubo consentimiento ni causa probable para realizarlo—no obstante, distinguió ese registro del registro e inspección rutinarios que se realizan en la frontera, sosteniendo la validez de esta última clase.

De igual modo las leyes de aduana y tarifas contienen diversas disposiciones para inspección y registro, algunas requiriendo "causa probable para sospechar" y otras exentas de ese requisito. Véase: 19 U.S.C. secs. 482, 1461, 1467, 1496, 1581 y 1582. En el caso *United States* v. *Ramsey*, de 6 de junio de 1977 (45 L.W. 4577), el Tribunal Supremo sostuvo la validez de un registro de unas cartas bajo la citada Sec. 482, que autoriza el registro de sobres cuando existe causa probable para sospechar que contienen mercancía ilegalmente introducida al país. La inspección de tales cartas fue efectuada por un agente de aduanas destacado en el correo de la ciudad de Nueva York, que al observar 8 sobres procedentes de Tailandia, sospechó que contenían mercancía o contrabando porque se veían abultados. El Tribunal, reconociendo que la norma de causa "razonable para sospechar" es menos exigente que la norma de causa probable bajo la Cuarta Enmienda, consideró eficaz el registro por estimarlo un registro de frontera. Sobre el particular expresó:

"Al presente no se requiere mayor elaboración reconocer que los registros en fronteras son razonables conforme al reconocido derecho que posee el soberano de protegerse, deteniendo y examinando las personas y objetos que entran al país, por el simple hecho de ocurrir en las fronteras." (Traducción nuestra.)

En su decisión el Tribunal reafirmó que los registros en las fronteras son razonables y no están sujetos a la exigencia de órdenes de allanamiento de la Cuarta Enmienda; no obstante, distinguió esos registros de aquellos que se realizan en

el tránsito interno del país. A pesar de que el Tribunal Supremo en tres ocasiones ha reiterado esa distinción entre el tránsito interno y externo, sin embargo, se ha negado a revisar la validez de registros de pasajeros que abordan aviones en Estados Unidos tanto para los vuelos al exterior como internos.

Esa clase de registros se ha estado practicando en los aeropuertos de la nación por más de siete años. Al principio esa práctica fue autorizada por reglamentos promulgados por la Administración Federal de Aviación. En el año 1974, el Congreso legisló para conferir aprobación estatutaria a esa reglamentación. (49 U.S.C. secs. 1356 y 1357.) El propósito de esa reglamentación fue evitar que los aviones comerciales fuesen abordados por pasajeros que portasen armas o explosivos sobre sus personas, para así reducir las posibilidades de piratería aérea. Cabe destacar que en su origen se requería que las personas a ser registradas hubiesen previamente activado un detector de metales férreos y que tuviesen algunas características que distinguen al pirata aéreo, pero al presente esos requisitos, al igual que otros inicialmente exigidos por los tribunales, se consideran no determinantes en cuanto a la validez del registro. A tal efecto en *United States* v. *Doran,* 482 F.2d 929, 932 (1973) y *United States* v. *Skipwith,* 482 F.2d 1272, 1276 ·(1973), se descarta el prototipo como determinante; en *United States* v. *Fern,* 484 F.2d 666 (1973), se valida un registro basado en sospechas, sin usarse el detector de metales. En *Skipwith,* supra, se elimina además el requisito de consentimiento expreso para el registro, al sostenerse que quienes se presentan al área de abordaje, al igual que quienes buscan entrar al país, están sujetos a ser inspeccionados a base de mera sospecha, o de sospecha infundada. Además se indica que las normas para registrar a una persona en la entrada de abordaje no deben ser más exigentes que las que se aplican en la entrada de las fronteras del país; que la razonabilidad no exige que en el área de abordaje

se registre sólo a las personas que se ajustan al prototipo de pirata, o que muestren nerviosidad, o que parezcan sospechosas.

Es significativo que dos de los casos que el Tribunal Supremo se negó a revisar resuelven que los registros en los aeropuertos son análogos a los registros fronterizos, en lo relacionado con las exigencias de la Cuarta Enmienda. *United States* v. *Cyzewski*, 484 F.2d 509 (1973), *cert. den.* 415 U.S. 902; *United States* v. *Moreno*, 475 F.2d 44 (1973), *cert. den.* 414 U.S. 840 (1973). Los individuos en esos casos actuaron sospechosamente y los registros produjeron drogas. En el caso *Cyzewski* las drogas aparecieron en una maleta que fue registrada después que la misma había sido aceptada y estaba bajo el control de la aerolínea.

Lo expuesto es suficiente para convenir con lo expresado en el caso *United States* v. *Edwards*, 498 F.2d 496 (1974), al efecto de que parece haber concenso, en los tribunales de circuito, de que los registros en los aeropuertos no han de condenarse bajo la Cuarta Enmienda por el solo hecho de que no se ajustan a categorías previamente reconocidas que eximen del requisito de orden de registro. (3)

---

(3) Véanse otros casos en *Validity, Under the Federal Constitution, of Preflight Procedures Used at Airports to Prevent Hijacking of Aircraft*, 14 A.L.R. Fed. 286 (1973). Véanse *United States* v. *López*, 328 F.Supp. 1077, 14 A.L.R. Fed. 252 (1971) y *United States* v. *Davis*, 482 F.2d 893 (1973), en relación con el procedimiento y medidas administrativas y estatutarias vigentes en esos casos.

Valga aclarar que en ninguno de los casos comentados estuvo envuelta la vigente legislación federal sobre piratería aprobada en el año 1974. Bajo 49 U.S.C. sec. 1357 (b) se requiere a la Administración Federal de Aviación que mediante reglamentación exija que los aeropuertos provean la presencia de oficiales de orden público para la protección de pasajeros contra actos de violencia criminal y de piratería. Bajo 49 U.S.C. sec. 1472 ($l$) (1) constituye delito el que una persona porte o atente portar armas peligrosas ocultas en lugares accesibles durante el vuelo o que ponga o intente poner explosivos en un avión. Bajo el inciso ($l$) (3) de esa sección lo anterior no aplica a armas contenidas en maletas no accesibles, que hayan sido declaradas a la línea aérea. Bajo 49 U.S.C. sec. 1511 (a) el Administrador debe requerir mediante reglamentación que la línea aérea se niegue a transportar pasajeros o propiedad, cuando los pasajeros no consientan el registro de

## II

El anterior análisis demuestra cómo la Cuarta Enmienda no presenta obstáculos a los registros que realizan agentes federales de inmigración y de aduana en los puntos de entrada del extranjero a la nación. Tampoco implica obstáculos a los registros que realizan agentes de líneas aéreas, o agentes federales o estatales, de pasajeros, carga y equipaje antes de entrar en aviones comerciales.

Ante el trasiego poblacional y los medios modernos de transportación y comunicación, los registros de la naturaleza descrita se han generalizado al extremo de que las personas que entran a la nación y las que abordan aviones en la nación conocen y saben que no tienen expectativas de privacidad en esos casos. Como dijo el Tribunal Supremo en *United States* v. *Thirty-Seven (37) Photographs*, 402 U.S. 363, 376 (1971):

"[U]n puerto de entrada no es el hogar de un viajero. Su derecho a la privacidad, por sí, no impide el registro de su equipaje ni la incautación de material ilegal, no protegido cuando tal posesión se descubre durante el registro. Los agentes de Aduana inspeccionan equipajes y tal autoridad no se cuestiona en el caso; es una antigua práctica que está íntimamente relacionada con la exclusión de artículos ilegales de este país." (Traducción nuestra.)

Expuesto lo anterior, veamos si esa expectativa mínima de privacidad se mantiene idéntica, o adquiere nuevas proporciones cuando los registros son realizados al amparo de legislación estatal.

El poder estatal para establecer leyes de inspección ha sido admitido tanto en el texto de la Constitución, como por

---

sus personas o de su propiedad. Bajo el inciso (b) de esa sección el contrato de transporte se entiende que incluye un acuerdo al efecto de que se negará la transportación cuando no se preste dicho consentimiento. En el caso *United States* v. *Fannon*, de 5 de junio de 1977, 46 L.W. 2049, el Tribunal de Apelaciones sostuvo la validez de un registro de carga, en la que se encontró heroína, al amparo de la citada Sec. 1511(b).

la jurisprudencia del Tribunal Supremo federal. El Art. I, Sec. 10, inciso 2 de la Constitución norteamericana, en lo pertinente proveee:

"Ningún estado podrá, sin el consentimiento del Congreso, fijar impuestos o derechos sobre las importaciones o exportaciones, salvo cuando fuere absolutamente necesario para hacer cumplir sus leyes de inspección . . . ." (Traducción nuestra.)

Ya desde el famoso caso *Gibbons* v. *Ogden*, 9 Wheaton 1, 203, 6 L.Ed. 23 (1824), el Tribunal Supremo se expresó en los siguientes términos en relación con el poder estatal sobre leyes de inspección:

"Pero se dice que las leyes de inspección regulan el comercio, y ciertamente así se reconoce en la constitución, como promulgadas en el ejercicio de ese poder que radica en los estados."

"[Las leyes de inspección] son una porción de esa masa inmensa de legislación que abarca todo dentro del territorio de un estado, no cedido al gobierno central; todo lo cual puede favorablemente ser ejercitado por los propios estados. Leyes de toda descripción sobre inspección, cuarentena y salubridad . . . son partes componentes de dicha masa." (Traducción nuestra.)

En la anterior cita el Tribunal Supremo reconoce que la mencionada disposición constitucional no sólo establece el derecho de los estados de aprobar leyes de inspección, sino implícitamente el derecho de vedar la exportación e importación de ciertos artículos. Obviamente ese derecho de prohibición comprende artículos peligrosos o dañinos.

En este contexto, debe recordarse que la Ley Núm. 22 impugnada en el presente caso, es de inspección, que autoriza el examen de equipaje con el objeto de hacerse cumplir nuestras leyes relacionadas con la prohibición de armas, explosivos y drogas.

El poder estatal para remover y destruir explosivos bajo el poder policial y posiblemente bajo leyes de inspección, fue aceptado en la opinión del Tribunal Supremo emitida por el Juez Marshall en el caso *Brown* v. *Maryland*, 12 Wheaton 419, 443, 6 L.Ed. 678, 687 (1827), al expresar lo siguiente:

"La facultad para dirigir la remoción de pólvora [explosivos] se deriva del poder de policía, que indiscutiblemente reside, y debe residir en los estados . . . . No estamos seguros de que no deba ser clasificado entre las leyes de inspección. La remoción y destrucción de artículos infectados o inadecuados es, indudablemente, un ejercicio de dicho poder . . . ." (Traducción nuestra.)

Y comentando los poderes de policía y de inspección estatales en el caso *The Mayor of the City of N.Y.* v. *Miln*, 11 Peters 102, 139–142, 9 L.Ed. 648, 662–664 (1837), se advierte que incuestionablemente:

"Al igual que cualquier país extranjero, un Estado tiene la misma e ilimitada jurisdicción sobre todas las personas y cosas dentro de sus límites territoriales, cuando tal jurisdicción no ha sido cedida ni limitada por la Constitución de los Estados Unidos. En virtud de ello, un estado no sólo tiene el derecho, sino el deber solemne, de promover la seguridad, felicidad y prosperidad de sus habitantes y propiciar su bienestar general, por cualquier acción legislativa que estima apropiada en la consecución de tales fines . . . .

Que . . . los poderes internos [de] policía, no están cedidos ni limitados, y en consecuencia, con relación a éstos, la autoridad del Estado es completa, no cualificada y exclusiva.

. . . . . . . .

. . . Con igual claridad, suponemos que un Estado tiene tanto derecho a protegerse, anticipadamente, contra los actos que ofenden sus leyes, como el de penalizar a los que cometen actos penables. El derecho a penalizar, o a prevenir un crimen, no depende en grado alguno de la ciudadanía de aquél que atenta contra la ley. El extranjero que pone sus pies en suelo de un Estado, está sujeto a la implementación de la ley como cualquier ciudadano.

. . . . . . . .

. . . El poder de aprobar leyes de inspección implica el derecho de examinar los artículos importados, y por lo tanto, están directamente sometidos al comercio; y si se encuentra que alguno es inadecuado o está infectado puede ser removido e inclusive destruido. Pero el poder de aprobar estas leyes de inspección forma parte del poder general de reglamentación interna de policía estatal." (Traducción nuestra.)

No albergamos duda de que el poder policía estatal es igual al de una nación soberana; que las leyes de inspección son parte de ese poder; que esas leyes incluyen el poder de inspección, remoción y destrucción; que el poder policía incluye la prevención del crimen, aun por personas que vienen del exterior.

El poder de inspección incluye, además, el ejercicio de esa facultad sobre artículos provenientes de otros estados. Así lo decidió el Tribunal Supremo en el caso *Patapsco Guano Co.* v. *Board of Agriculture*, 171 U.S. 345, 357 (1897), al declarar:

"Siempre que las leyes de inspección actúen sobre la materia antes de que se convierta en un artículo de comercio, son válidas y también cuando operan sobre artículos introducidos desde un estado a otro, ellos disponen para la inspección en el ejercicio del poder de auto protección llamado comúnmente poder de policía." (Traducción nuestra.)

Igualmente dicho foro ha reconocido el poder de los estados para prohibir la introducción de artículos que no están en el comercio legítimo. En *Compagnie Francaise* v. *State Board of Health, Louisiana*, 186 U.S. 380, 391 (1902), el Tribunal reiteró la norma enunciada en varios casos, de que:

". . . se decidió que una ley estadual prohibiendo de manera absoluta la introducción, bajo cualquier circunstancia, de objetos infectados, era válida por no ser de comercio legítimo tales objetos . . . el poder de prohibición absoluta, adicionalmente surge cuando la cosa prohibida no está en el comercio, y por ende no comprendida en el comercio interestatal o foráneo." (Traducción nuestra.)

El más reciente caso que reafirma el poder estatal para aprobar leyes de inspección es *California* v. *Thomson*, 313 U.S. 109, 114 (1941), que declara que los estados pueden aprobar leyes de inspección aplicables a artículos en el comercio interestatal, siempre que dichas leyes no obstruyan sustancialmente ni discriminen en el comercio interestatal y el Congreso no haya ocupado el campo. Debemos enfatizar

que nadie cuestiona que la inspección del equipaje de pasajeros que arriban a Puerto Rico es un asunto sobre el cual el Congreso haya legislado; *no existe campo ocupado por el Gobierno Federal en la gestión encomendada a la Policía de Puerto Rico.*

Hace apenas dos meses que el Tribunal Supremo mediante acción sumaria denegó una apelación que planteaba la inconstitucionalidad de una ley de inspección del Estado de Florida en cuanto (1) autorizaba a detener porteadores en las carreteras estatales para la inspección de productos agrícolas sin que existiera causa probable o sospecha de que transportaban productos agrícolas, y (2) autorizaba un registro irrazonable y contrario al derecho de privacidad y al derecho de viajar libremente. La apelación aparece resumida en 46 L.W. 3005 y denegada en 46 L.W. 3180 (Sesión del 4 de octubre de 1977). El caso sostiene que "el apelado tiene plena autoridad bajo el poder de policía del Estado de Florida para realizar inspecciones de agricultura en los vehículos" y concluye diciendo: "Es nuestra posición que el requisito del mencionado estatuto en el sentido de que todos los camiones y *trailers* se detengan en la estación de inspección del apelado para una inspección es enteramente razonable y un ejercicio válido del poder de policía del Estado." *Stephenson* v. *Dept. of Agr. & Consumer Services,* 342 So.2d 60 (1977). (Traducción nuestra.)

Los principios que surgen de la jurisprudencia comentada, entrelazados y ordenados en forma sumaria, establecen lo siguiente: El poder policía de los estados es de naturaleza igual al que tienen las naciones soberanas, e incluye: a) la prevención del crimen, aun por extranjeros que entren al estado; b) la revisión y destrucción de explosivos; y c) la prohibición de la entrada de artículos que estén fuera del comercio legítimo. Resumiendo, las leyes de inspección emanan de ese poder policía, y conllevan el poder de registrar sin causa probable y de restringir y prohibir la entrada de artículos

de otros estados, siempre que dichas leyes no sean discriminatorias, ni obstruyan sustancialmente el comercio inter-estatal.

En virtud de los principios expuestos, es clara la facultad que tienen los estados al amparo de sus poderes de policía y de inspección para autorizar la inspección de maletas y carga provenientes de otros estados para ocupar armas, explosivos y drogas, con el fin de proteger contra invasiones a la salud, bienestar y seguridad interna del estado.

## III

Bajo nuestra Constitución, los poderes de policía e inspección del Estado Libre Asociado ciertamente no son inferiores a los que tienen los estados de la Unión. En el caso *Examining Board* v. *Flores de Otero*, 426 U.S. 572, 594, 597 (1976), el Tribunal Supremo reconoció que el propósito del Congreso en la legislación de los años 1950 y 1952, fue conceder a Puerto Rico el grado de autonomía e independencia normalmente asociada con los estados de la Unión; pero dicho foro también advirtió que Puerto Rico ocupa una relación con los Estados Unidos que no tiene paralelo en la historia de la nación. *Id.*, 596.

Esa relación sin paralelo puede conllevar, como en efecto conlleva, que Puerto Rico tenga prerrogativas y poderes que la Constitución federal deniega a los estados de la Unión. Por vía de ejemplo, bajo la Sec. 3 de la Ley de Relaciones Federales, Puerto Rico tiene poder para imponer impuestos sobre importaciones, poder que es denegado a los estados por el inciso 2 de la Sec. 10 de la Constitución. Y bajo las Secs. 9, 38 y 58 de dicha ley no todas las leyes federales necesariamente aplican a Puerto Rico y en específico no aplican las leyes de contribuciones, ni de comercio interestatal, ni las que confligen con dicha Ley de Relaciones Federales. Los estados, en cambio, no pueden escapar de la aplicación de leyes federales por ser éstas parte de la ley suprema de la Nación. *Burton* v. *United States*, 202 U.S. 344, 368 (1906).

Puerto Rico tiene además un poder implícito de inspección y registro que no tienen los estados y que deriva de la facultad de imponer contribuciones sobre importaciones.

Esa facultad sobre importaciones es de naturaleza idéntica a la que tiene el gobierno federal sobre importaciones en la nación. En virtud de esa facultad es que el Tribunal Supremo ha reconocido que los agentes de aduana tienen autoridad en las fronteras no sólo para hacer cumplir las leyes tarifarias, sino para evitar que a la nación se introduzca contrabando y material ilegal. En lo que respecta al registro de frontera o su equivalente funcional, la analogía y consecuencia jurídica es inevitable.

La Ley de Relaciones Federales implícitamente ha otorgado a Puerto Rico, igual autoridad en las fronteras de la Isla, de inspección y registro. La Sec. 3 de dicha ley, después de autorizar impuestos sobre importaciones "ordena a los oficiales de aduanas y del servicio postal de Estados Unidos que ayuden a los debidos funcionarios del Gobierno de Puerto Rico en cobro de estas contribuciones."

La "ayuda" a que hace referencia la transcrita disposición ciertamente no es en los aspectos administrativos (tasación, ejecución, etc.) del cobro de las contribuciones, sino en las áreas de inspección y registro, que son las que caen bajo el ámbito de los inspectores de correos y de aduanas. Y si el deber y obligación de los agentes federales es de auxiliar y *ayudar* en la inspección y registro a los funcionarios de nuestro país, ello necesariamente implica la existencia de un *poder* para esa inspección y registro que reside en el Estado Libre Asociado; como corolario, Puerto Rico goza del poder para hacer esos registros sin que necesariamente medie la ayuda federal.

A la luz de lo expuesto, es claro que Puerto Rico tiene un poder de inspección y registro en sus fronteras idéntico al que los estados de la Unión tienen en sus respectivas fronteras; y que en adición, tiene poder análogo al que gozan los agentes

federales de aduana sobre las fronteras de la nación. En virtud de cada uno de esos poderes es que surge la facultad de Puerto Rico, para autorizar la búsqueda de armas, explosivos y drogas en cargamentos o equipaje de pasajeros provenientes de los Estados Unidos sin que medie la norma de motivos fundados.

## IV

Ninguna de las decisiones del más alto foro Federal es contraria a las conclusiones expresadas, aun tomando en cuenta los casos de *Carroll* v. *United States*, 267 U.S. 132 (1925) ; *Almeida-Sánchez* v. *United States*, supra, y *United States* v. *Ramsey*, supra, que reiteran la "distinción entre registros internos en la nación, que requieren causa probable, y registros fronterizos."

Esa norma, a primera vista, aparenta ser contraria, pero no lo es. Al analizar y aplicar guías jurisprudenciales no podemos extraernos del contexto en que fueron expresadas y aplicarlas ciega y mecánicamente a situaciones no contempladas al emitirse. En *Carroll*, *Almeida* y *Ramsey* estaban envueltos agentes y leyes federales. *Carroll* trataba de inspectores autorizados para registrar vehículos para la incautación de bebidas alcohólicas. Registraron un automóvil porque sus ocupantes, tiempo antes habían tratado de suministrarles bebidas; tenían razón para creer que eran traficantes de bebidas; y venía de Detroit, que era un centro conocido de introducción de bebidas al país. El Tribunal estimó que tales hechos constituían causa probable bajo la Cuarta Enmienda y no era necesaria una orden de registro.

Los casos *Almeida* y *Ramsey*, como hemos visto, versaron sobre agentes federales de aduana y de inmigración, ambos con autoridad para hacer registros en las fronteras nacionales. La aplicación a éstos, de la distinción entre registros fronterizos y registros internos fue totalmente apropiada, ya que la autoridad de registro de esos agentes se limita a la frontera *y no tienen autoridad para hacer registros dentro de*

*la nación.* Los agentes de bebidas en el caso *Carroll,* por el contrario, tenían autoridad para hacer registros en cualquier parte de la nación. Fue esa autoridad federal la que el Tribunal temió se usara en forma indiscriminada para hacer registros en todas las partes del país e impuso la restricción de que los registros se practicaran cuando existiera causa probable para creer que se transportaba licor.

Surge pues que el Tribunal tenía ante sí leyes y agentes federales en los casos mencionados y es con relación a esas leyes y agentes que el Tribunal hizo sus pronunciamientos. No estaba envuelta en esos casos la autoridad estatal para hacer registros e inspecciones en sus fronteras. Esa autoridad tampoco ha estado envuelta en ninguna decisión del Tribunal Supremo relacionada con la Cuarta Enmienda.

Es pertinente, en lo relativo a esa autoridad fronteriza estatal, lo expresado por el propio Tribunal en el caso *Carroll* y reiterado en el caso *Ramsey,* al efecto de que:

"La 4ta Enmienda debe ser interpretada a la luz de lo que se consideró registro irrazonable cuando se adoptó, y de forma y manera que proteja el interés público y los derechos del ciudadano individual." 267 U.S. 149 y escolio 14 del caso *Ramsey.* (Traducción nuestra.)

Las primeras diez enmiendas fueron propuestas a la nación dos años después de aprobarse la Constitución, en el año 1787, y fueron ratificadas por los diversos estados en años subsiguientes. Al proponerse dichas enmiendas era harto conocido el poder estatal de inspección y registro, pues se trata de un poder que la propia Constitución reconoce. Y ese poder fue reconocido por el Tribunal Supremo en el caso *Gibbons* v. *Ogden,* supra, tres décadas después de ratificarse las primeras diez enmiendas por varios de los estados. Es evidente, por consiguiente, que si la Cuarta Enmienda debe interpretarse a la luz de lo que se consideró razonable cuando fue adoptada, dicha enmienda no puede interpretarse al presente en el sentido de imprimir a las inspecciones y regis-

tros estatales de equipajes en los aeropuertos y muelles para evitar el contrabando y proliferación en el país de armas, explosivos y sustancias controladas, el carácter de irrazonables. "La Decimocuarta Enmienda no es un requisito pedagógico de lo impracticable." Holmes, O. W., *Dominion Hotel* v. *Arizona*, 249 U.S. 265, 268 (1919).

Hemos visto que el Tribunal Supremo nunca ha exigido que las inspecciones estatales fronterizas se realicen sólo cuando existe causa probable bajo la Cuarta Enmienda. Dudamos mucho que el Tribunal en el futuro imponga esa exigencia, ya que las inspecciones estatales fronterizas tienen el mismo propósito que las inspecciones nacionales fronterizas, y tal exigencia tendría el efecto de hacer inoperante, ese poder de inspección.

De otro lado, los registros autorizados para ocupar armas y explosivos en el abordaje de aviones fortalecen nuestra conclusión, pues establecen otra excepción al dogma contra registros en el tránsito interno de la nación. Esos registros tienen, además, el efecto de eliminar las expectativas de privacidad de los pasajeros al abordar aviones. No sólo se eliminan esas expectativas, sino que bajo la ley se supone la existencia del consentimiento para el registro de las personas y equipaje que entran en aviones comerciales. (49 U.S.C. sec. 1511.) Si los pasajeros han consentido a ese registro, resulta mínima y leve la intromisión a la privacidad, cuando el registro se efectúa; y además, cuando los pasajeros salen del avión.

Cabe observar que si bien el Tribunal Supremo en el caso *United States* v. *Chadwick*, resuelto el 27 de junio de 1977, 45 L.W. 4797, sostuvo que las expectativas de privacidad en equipaje son mayores que las que existan en un automóvil, también expresó que el equipaje puede estar expuesto a la vista pública como condición de entrada en las fronteras o al viajar en porteadores. Esto último convalida los registros de maletas de personas que viajan en aviones comerciales.

Aunque el Tribunal Supremo tampoco ha exigido que las inspecciones estatales se justifiquen a base de una necesidad imperiosa, la autorizada por la Ley Núm. 22 satisface esa norma.

En lo que respecta a armas y explosivos, la situación de Puerto Rico es única. Por razón de una amenaza contínua a nuestra seguridad interna, la Legislatura ha aprobado leyes estrictas sobre posesión, portación y venta de armas de fuego y sobre venta y transportación de explosivos. (25 L.P.R.A. sec. 411 *et seq.*) Esas leyes no han cumplido su cometido. Una de las causas principales para ese fracaso es que no se había estado controlando la introducción ilegal al país de armas y explosivos provenientes de los Estados Unidos. La Ley Núm. 22, objeto de discusión en el presente caso, tuvo el propósito de conjurar ese mal.

Mediante la introducción por contrabando de armas en Puerto Rico se aumenta el número de armas ilegales. Al año 1974 se estimaba que las armas ilegales excedían de un cuarto de millón, aparte de las que estaban legalmente inscritas, calculadas en alrededor de 100,000.[4] La mayor parte de esas armas, ilegalmente poseídas, están en manos de personas del bajo mundo y han sido traídas desde los Estados Unidos. Esas cifras son alarmantes, considerando que Puerto Rico tiene una población masculina de alrededor de millón y medio de personas.

En contraste con la política pública de Puerto Rico, la posesión y portación de armas en la nación tradicionalmente se consideró como un derecho inalienable del pueblo. Tan arraigado estaba ese derecho al nacer la nación, que fue plasmado en la Constitución por vía de la Segunda Enmienda, que dispone que "Siendo necesaria para la seguridad de un Estado libre una milicia bien organizada, no se coartará el derecho del pueblo a tener y portar armas."

---

[4] Informe de la Comisión para el Estudio de la Policía rendido al Consejo para la Reforma de la Justicia en 23 de enero de 1974, pág. 126.

En *United States* v. *Miller*, 307 U.S. 174 (1939), el Tribunal Supremo, buscando las raíces de esa enmienda constitucional encontró que al proponerse la misma existían leyes estatales que proveían para una milicia civil que requerían que las personas se equipasen con armas de su propiedad. El Tribunal Supremo, sin embargo, ante las exigencias de la presente época, prácticamente ha nulificado el alcance de esa enmienda. En el caso *Miller*, el Tribunal sostuvo que la Ley Federal sobre Armas de Fuego del año 1934, no constituía una usurpación de poderes estatales y expresó, además, que en ausencia de prueba al efecto, no podía sostenerse que el arma envuelta en el caso tenía relación alguna con una milicia ordenada, bajo la Segunda Enmienda. Ya antes del caso *Miller* existía la doctrina al efecto de que la Segunda Enmienda constituía una prohibición contra el gobierno federal, pero no contra los gobiernos estatales, los que tenían amplios poderes para prohibir armas. Véanse *Pueblo* v. *González*, 36 D.P.R. 248 (1927) y *Pueblo* v. *Díaz Cintrón*, 36 D.P.R. 571 (1927).

Ante el alarmante auge de la criminalidad en la nación en los últimos años, el Congreso determinó que no podía tolerarse más la libertad con que los estados autorizaban la posesión y venta de armas y en el año 1968 aprobó la Ley sobre el Control de Armas, que canaliza la venta de armas a través de armeros autorizados y les prohíbe la venta de armas a ciertas clases de personas, o cuando la venta sea contraria a una ley estatal.

Al aprobar esa ley, el Congreso determinó que la criminalidad violenta en Estados Unidos se debía, en forma significativa, a la facilidad con que podían obtenerse armas; que existía un tráfico generalizado de armas y que las mismas estaban disponibles a personas cuya posesión era contraria al interés público. El propósito de la Ley de 1968 fue reducir el crimen evitando la posesión de armas por personas incompetentes o con historial criminal. Véase *Huddlestone* v. *United*

*States*, 415 U.S. 814, 824–829 (1974), en relación con ese historial legislativo. Véase, además, escolio 11 del caso *Scarborough* v. *United States*, resuelto el 6 de junio de 1977 (45 L.W. 4570), donde se dice que el Congreso encontró que las leyes estatales no eran adecuadas para prohibir la posesión de armas por personas con probabilidad de usarlas ilegalmente; y que el propósito del Congreso fue contribuir con los esfuerzos estatales. Además, *Barrett* v. *United States*, 423 U.S. 212 (1976).

La ley federal sobre el Control de Armas de Fuego (18 U.S.C. secs. 921–928) extiende su aplicación a Puerto Rico y en la Sec. 921 se expone su Exposición de Motivos. Entre las prohibiciones preceptuadas en dicha ley, en lo concerniente al comercio interestatal de armas, se limita el tráfico a armeros autorizados mediante licencia al efecto y se prohíbe la transportación y recibo de armas por personas que las adquieran fuera del estado en que residan. También se prohíbe la venta de armas a personas acusadas de delitos graves, a fugitivos, a personas adictas a drogas y a personas con defectos mentales. *Taxativamente la ley dispone que su propósito no es desplazar legislación estatal sobre la materia.* En su Sec. 963 se autoriza las inspecciones en los negocios de armeros. En el caso *United States* v. *Biswell*, 406 U.S. 311 (1972) se sostuvo la validez de esas inspecciones. El tribunal decidió que no es necesaria una orden de registro cuando la ley autoriza una inspección reglamentaria; esa inspección contribuye a un interés federal urgente; y las posibilidades de abuso y la amenaza a la privacidad no son de dimensiones impresionantes. Expresó, además, que si la ley ha de hacerse cumplir y la inspección ha de ser efectiva, la inspección sin orden de registro debe considerarse razonable bajo la Cuarta Enmienda. Con referencia al tráfico interestatal de armas de fuego, señaló:

". . . ciertamente una estrecha vigilancia de este tráfico es de suma importancia al esfuerzo federal de prevenir crímenes vio-

lentos *y en auxiliar a los Estados en la reglamentación del trá-fico de armas de fuego* dentro de sus fronteras . . . . Intereses apremiantes están en juego, y la inspección es parte crucial del diseño regulatorio . . . ." (Bastardillas y traducción nuestras.)

## V

Lo expresado por el Tribunal Supremo en relación con el tráfico de armas e inspecciones, es de particular interés en el caso de Puerto Rico. Nuestra ley sólo autoriza la portación y transportación de armas por ciudadanos particulares bajo sólo dos circunstancias específicas y en ambas se requiere que la persona previamente haya obtenido licencia para ello, en el Tribunal Superior. La primera es cuando la persona trans-porta dinero, mientras esté en el acto de transportarlo (25 L.P.R.A. sec. 430 (b) 6) ; y la segunda es cuando la per-sona se encuentra en peligro de muerte o de grave daño cor-poral (25 L.P.R.A. sec. 431).

Si es que nuestra ley ha de hacerse cumplir, es imperativa la inspección en los aeropuertos y muelles, de maletas y carga proveniente de los Estados Unidos. De lo contrario, nuestra ley continuará siendo inefectiva y continuará el alarmante uso de armas en delitos graves contra la persona y propiedad y su proliferación entre individuos del bajo mundo. La intro-ducción de armas en Puerto Rico por personas no autorizadas es ilegal tanto bajo nuestra ley, como bajo la ley federal. El evitar esa introducción representa un interés apremiante de vital importancia, tanto para nuestro gobierno, como para el federal. La Cuarta Enmienda no impone a los estados miopía intelectual para bregar con los problemas serios que atentan contra la seguridad interna. El propio Tribunal Supremo re-conoció que el sistema de inspección provisto en la ley federal era parte esencial para el cumplimiento de esa ley.

De igual modo, la inspección para la búsqueda de drogas representa también otro esfuerzo de Puerto Rico para con-jurar un mal que está minando los cimientos de nuestra socie-dad. Hay estrecha relación entre el tráfico y uso de drogas y

el auge de la criminalidad en el país. El ciudadano corriente ya no tiene seguridad en su hogar, ni en su vehículo, ni al caminar por las calles; pero no por el uso y tráfico de drogas en sí, sino por la portación y uso de armas letales por personas relacionadas con su comercio ilícito. La atención captada por los aspectos criminales del tráfico y uso de drogas han desviado el reconocimiento del verdadero fin de las leyes sobre drogas, cuyo objetivo es evitar su uso por considerarse dañinas a la salud. Hemos visto, al discutir el poder estatal de inspección, que la protección de la salud es un ejercicio válido constitucional de ese poder.

Finalmente, las constituciones, al igual que las leyes deben responder a las realidades sociales que sirven. Cuando por interpretación rígida permeada de teorías abstractas, se crea un abismo entre tal realidad y los preceptos legales, se paraliza la utilidad del documento constitucional. "La protección más liberal de los derechos del individuo, establecida . . . en la carta de derechos, no puede perder de vista el básico principio de que la salud del pueblo es la suprema ley. Los derechos individuales tienen que entenderse dentro del cuadro general de la sociedad con arreglo a las limitaciones inherentes a la vida en común." *Diario de la Convención Constituyente*, 2576. Estoy convencido de que en la colisión entre el valor individual privado y el comunitario público que hay en el caso de autos, debe prevalecer el segundo según fue concebido por la Asamblea Legislativa y lo autoriza el diseño constitucional vigente.